**TENNESSEE VALLEY AUTHORITY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 513–87C.**

United States Claims Court.

Nov. 12, 1987.

James E. Fox, Knoxville, Tenn., for plaintiff. Edward S. Christenbury, Justin M.

Schwamm, Sr., Robert C. Glinski, Peter K. Shea and John P. Kernodle, Tennessee Valley Authority, of counsel.

John W. Showalter, Washington, D.C., with whom were J. Christopher Kohn and Asst. Atty. Gen. Richard K. Willard, for defendant. Marc Johnston and Jake Vreeland, of counsel.

Steuart H. Thomsen, Washington, D.C., for Occidental Chemical Corp., amicus curiae. William A. Vaughan, Robert W. Clark and Michael J. Shea, Sutherland, Asbill & Brennan, of counsel.

## ORDER

NETTESHEIM, Judge.

After this case was transferred from the United States District Court for the Eastern District of Tennessee, defendant moved to dismiss plaintiff's contract claim for lack of subject matter jurisdiction. Plaintiff has opposed, and argument has been held.

## FACTS

The following facts are undisputed. Plaintiff Tennessee Valley Authority ("plaintiff" or "TVA") and the Atomic Energy Commission entered into two contracts, AT–(40–1)–3760 and AT–(40–1)–3761, on December 1, 1967. For purposes of this order, the Department of Energy ("DOE"), a successor to the Atomic Energy Commission, will be referred to as the cognizant federal agency.[1] Both contracts bound TVA to supply electric power to DOE's uranium enrichment facilities. AT–(40–1)–3760 corresponded to DOE's facility at Oak Ridge, Tennessee (the "Oak Ridge contract"), and AT–(40–1)–3761 covered the Paducah, Kentucky facility (the "Paducah contract"). The contracts are otherwise identical.

---

1. The Atomic Energy Commission and the Energy Research and Development Administration were predecessors to DOE. The Atomic Energy Commission was abolished, and most functions of the Commission were vested in the Nuclear Regulatory Commission and the Administrator of the Energy Research and Development Administration. *See* Energy Reorganization Act of 1974, Pub.L. 93–438, 88 Stat. 1233 (1974). The duties of the Energy Research and Development Administration and its officers were vested in the Secretary of Energy, unless otherwise specifically provided, as part of the creation of DOE. *See* Department of Energy Organization Act, Pub.L. 95–91, 91 Stat. 565 (1977).

Each contract, as amended,[2] provides a contract term through June 1990, thereafter continuing on a year-to-year basis through June 1995. However, an early termination clause permits either party, upon eight years notice of an aggregate power reduction, to rescind the contract. The contract also provides that such reductions must be made in successive steps of less than 1,000,000 kilowatts (kw) per year, beginning after the eight-year notice date.

DOE sent TVA a series of reduction notification letters dated December 24, 1981, December 20, 1982, December 23, 1983, December 24, 1984, and March 7, 1986, in order to reduce the amount of power available under both contracts from 4,485,000 kws to zero. The reduction was to take place by successive 1,000,000–kw increments in December 1989, 1990, 1991, and 1992 with a final 485,000–kw reduction in March 1994.

Section 6 of the Oak Ridge and Paducah contracts memorializes the parties' rate schedule. Essentially, DOE's monthly rate includes two charges: 1) a capacity charge (a fee for making potential energy available), and 2) an energy charge (a fee for actual energy used).[3] Since the capacity charge is tied to the amount of potential power being made available, this fee must be paid during both the eight-year notice period and the ensuing reduction period until a zero potential power level is realized.

The rate section also contains a clause for future modification:

It is recognized that the above rates for power and energy and the adjustments thereto are based on TVA's prevailing General Power Rate—Schedule C–2 (July 31, 1967) which may be modified or replaced by TVA from time to time. TVA shall have the right, after discussion with ... [DOE], to revise the rates, charges, and adjustments provided for herein to reflect modifications or re-

placements of said prevailing rate schedule from time to time.

TVA's most recent rate schedule, General Power Rate Schedule GP–11, became effective on October 2, 1986.

DOE discontinued making full monthly payments in June 1987 by resisting the scheduled capacity charge, advising plaintiff by letter of June 10, 1987:

We have concluded that a fairer estimate of an appropriate total demand charge through 1994 is less than $1 billion. Because we have already paid more than our fair share, we believe that DOE would be justified in withholding the entire amount of the remaining FY 1987 demand charges. However, we have decided in the spirit of good faith negotiations not to take such action. Instead, we will gradually reduce our FY 1987 payments related to unused contract demand charges in DOE's arrangement with TVA, in accordance with the following schedule:

| Month | Percent To Be Paid | Approximate Amount To Be Paid (Millions of Dollars) |
| --- | --- | --- |
| June | 90% | $38.25 |
| July | 80% | $34.00 |
| August | 70% | $29.75 |
| September | 60% | $25.50 |
| October | 50% | $21.25 |

Beginning with the October 1987 payment, DOE will pay 50 percent of the monthly demand charges identified in your letter of April 7, 1987, until a mutually satisfactory resolution of this matter can be reached. This schedule should avoid sudden, adverse consequences to TVA and its ratepayers while at the same time providing a more equitable arrangement for the ratepayers of other utilities that purchase DOE enrichment services. We will, of course, continue to pay in full the appropriate charges for power actually used at the Oak Ridge, Tennessee, complex.

Plaintiff originally filed an action in the United States District Court for the Eastern District of Tennessee seeking, *inter*

---

**2.** At DOE's request the contracts were amended in November 1968 to increase the amount of available power to 3,165,000 kilowatts. Later amendments in 1973–1974 increased the available energy to 4,485,000 kilowatts.

**3.** A third charge, the customer charge, is not relevant to this dispute.

*alia,* a declaratory judgment that DOE was required to follow TVA's rate schedule and a writ of mandamus requiring that DOE pay the rates established by the contracts. *See Charles H. Dean, Jr., et al. v. John S. Herrington, et al.,* Civ. No. 3–87–436 (E.D. Tenn., filed June 16, 1987).[4] By order of August 4, 1987, the district court transferred the case to this court pursuant to 28 U.S.C. § 1631 (1982). *Dean v. Herrington,* 668 F.Supp. 646 (E.D.Tenn.1987). TVA filed an amended complaint on August 20, 1987, seeking the actual amount due TVA under its contracts with DOE, which totaled $124,141,461.62 as of August 7, 1987.[5]

## DISCUSSION

Defendant argues, much as it did before the district court, that plaintiff's claim is not justiciable since it amounts to a dispute between two Executive branch agencies. Defendant's current argument takes three tacts: 1) The judicial branch cannot resolve interagency disputes; 2) Exec. Order No. 12,146, 3 C.F.R. 409 (1979), requires submission of TVA's claim to the Attorney General before proceeding in court;[6] and 3), a new argument, the Oak Ridge and Paducah contracts are not "true contracts." The district court rejected the first two arguments, *Dean,* 668 F.Supp. at 650–53, and plaintiff seeks to enforce these rulings in this court as law of the case. Although it asked the district court to rule on justiciability and the application of Exec. Order No. 12,146, defendant argues that the

district court's analysis on these issues of law should be given no deference.

### 1. *Law of the case*

The purpose of the law of the case doctrine was summarized by the Federal Circuit in *Gindes v. United States,* 740 F.2d 947, 949 (Fed.Cir.) (quoting *Messenger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912)), *cert. denied,* 469 U.S. 1074, 105 S.Ct. 569, 83 L.Ed.2d 509 (1984): "The doctrine of law of the case 'expresses the practice of courts generally to refuse to reopen what has been decided.'" The Federal Circuit went further: "The doctrine rests upon the important public policy that '[n]o litigant deserves an opportunity to go over the same ground twice, hoping that the passage of time or changes in the composition of the court will provide a more favorable result the second time.'" *Gindes,* 740 F.2d at 949 (quoting *United States v. Turtle Mountain Band of Chippewa Indians,* 222 Ct.Cl. 1, 6, 612 F.2d 517, 520 (1979)); *accord Branning v. United States,* 784 F.2d 361, 363 (Fed.Cir. 1986).

◼ The decisions of transferor courts are treated with the same dignity under principles of the law of the case as determinations of this court. *See Dynalectron Corp. v. United States,* 4 Cl.Ct. 424, 431, *aff'd,* 758 F.2d 665 (Fed.Cir.1984). Yet, a court that lacks subject matter jurisdiction cannot establish law of the case, since "any 'decision' by a court lacking subject matter

**4.** The Tennessee Valley Industrial Corporation ("TVIC"), a representative organization of several of TVA's large "direct-serve" customers, sought to intervene. The district court granted TVIC's motion to intervene on July 1, 1987. The Tennessee Valley Public Power Association ("TVPPA"), which represents municipal and private distributors of TVA power, also had filed suit against DOE, *Tennessee Valley Pub. Power Ass'n, et al. v. John S. Herrington, et al.,* Civ. No. 3–87–439 (E.D.Tenn., filed _____, 1987), and the case was consolidated with *Dean.* In its order transferring *Dean,* the court also dismissed both the intervenor and the complaint filed by TVPPA for lack of standing. TVPPA filed a notice of appeal to the United States Court of Appeals for the Sixth Circuit on September 18, 1987, and filed a motion for injunction pending

appeal on September 22, 1987, which has been denied.

**5.** This estimated amount will be revised to coincide with the date of final judgment if plaintiff prevails.

**6.** Since Exec. Order No. 12,146 allows an agency to proceed in court after submission of the dispute to the Attorney General, the issue really is not a justiciability question, but an inquiry into whether all mandatory administrative remedies have been pursued. Defendant views the Executive Order as delegating the President's dispute resolution authority to the Attorney General and reads the Executive Order as foreclosing any judicial remedy. The subject is discussed more fully *infra* note 9.

jurisdiction is a nullity, void ab initio." *Alabama Hosp. Ass'n v. United States,* 228 Ct.Cl. 176, 182, 656 F.2d 606, 610 (1982), *cert. denied,* 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982). "Such rulings are entitled to no weight either as precedent or as law of the case." *Hydaburg Coop. Ass'n v. United States,* 229 Ct.Cl. 250, 254, 667 F.2d 64, 66 (1981), *cert. denied,* 459 U.S. 905, 103 S.Ct. 207, 74 L.Ed. 2d 166 (1982) (citation omitted).

### 2. *Transfer*

Plaintiff argues initially that the district court resolved the justiciability of the suit and the applicability of Exec. Order No. 12,146 as an incident to transferring the case to this court.

■ 28 U.S.C. § 1631 (1982), provides that a federal court without jurisdiction shall transfer the case to the proper court if the interest of justice so warrants:

> Whenever a civil action is filed in a court ... and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred....

Thus, once a court determines that jurisdiction is wanting, the only remaining inquiries are whether the case at the time it was filed could have been brought in the transferee court and whether transfer is in the interest of justice. *Jackson v. United States,* 10 Cl.Ct. 691, 695 (1986); *Omega World Travel, Inc. v. United States,* 9 Cl.Ct. 623, 626–27 (1986). Neither of these statutory criteria requires that a court delve into the merits of a claim. *See, e.g., Williams v. United States,* 11 Cl.Ct. 189, 192 (1986), *aff'd,* 818 F.2d 877 (1987); *Jackson,* 10 Ct.Cl. at 695.

■ Incident to the transfer decision, the court should determine whether or not all administrative remedies have been exhausted if that issue is known to the court. *See Last Chance Mining Co. v. United States,* 12 Cl.Ct. 551, 558–59 (1987); *Busby School of N. Cheyenne Tribe v. United States,* 8 Cl.Ct. 588, 595 (1985). This type of pretransfer determination fulfills the requirement that transfer be in the interest of justice, *see Last Chance Mining Co.,* 12 Cl.Ct. at 559, and subsequently becomes law of the case.

The Claims Court has no precedent directly addressing whether the justiciability issue was essential to the district court's transfer decision. Once the district court in *Dean* determined that it lacked subject matter jurisdiction because TVA was asserting a contract claim, it could have transferred the case to this court and allowed the question of justiciability to be resolved here. However, this court is not uniquely suited to determine justiciability, defendant put forth the issue, and the district court was faced with the requirement that transfer be made if in the interest of justice. Although judicial economy is served by resolution of such questions before transfer, prudence counsels against applying the doctrine of law of the case to a justiciability determination.

If a court without subject matter jurisdiction was allowed to embark upon ancilliary jurisdictional issues, chaos surely would result. A plaintiff could file in improper forums seeking to attain a favorable determination before transfer. Moreover, the sword could cut in the other direction if a court lacking subject matter jurisdiction refused to transfer based upon a determination of justiciability that was wrong. The district court's conclusion on justiciability, while given respectful consideration and concurred in by this court, is not law of the case.[7]

Before the district court defendant contended that Exec. Order No. 12,146 required that the claim be submitted to the

---

7. In *Andrews v. United States,* 6 Cl.Ct. 204, 210–211 (1984), *aff'd,* 770 F.2d 179 (Fed.Cir.1985), this court refused to transfer a claim within the district court's jurisdiction based on the affirmative defense of laches. However, it had been concluded previously that laches also barred plaintiff's contract claims within this court's jurisdiction.

Attorney General. The district court ruled on the applicability of the Executive Order in deciding whether the case should be transferred to the Claims Court or to the Attorney General. To transfer a case without considering an issue of exhaustion, especially when put in issue by a party, would not be consistent with a transfer in the interest of justice. Although the matter was fairly before the district court, this court has determined, for reasons to be discussed, that the decision comes within an exception to the law of the case doctrine.

### 3. *Justiciability*

■ Defendant argues that twin limits to the power of this court compel the conclusion that the dispute is nonjusticiable. The first limit posited by defendant is that since the dispute is between two entities within the Executive (indeed, the dispute involves property of the United States, *i.e.*, the electricity generated by TVA), the Constitution through separation of powers commits its resolution to the Executive as an intrabranch dispute. The second is the nature of the dispute. According to defendant, the Executive Order commits resolution of a dispute between Executive agencies like TVA and DOE to the Executive. *See infra* note 9.

The district court held that TVA's complaint set forth a justiciable claim, relying on *United States v. Nixon*, 418 U.S. 683, 696–97, 94 S.Ct. 3090, 3101–02, 41 L.Ed.2d 1039 (1974):

> The claim raised is of a type traditionally thought to be justiciable: stripped of its surplusage it is essentially a breach of contract claim. It is also raised in a setting that assures "concrete adverseness" of the parties. The Court observes that TVA's unique independence as a federal agency sharpens this adverseness.

*Dean*, 668 F.Supp. at 652 (footnote omitted). The district court questioned the holding in *United States ex rel. TVA v. Easement & Right of Way over Certain Land in Bedford County, Tennessee*, 204 F.Supp. 837, 839 (E.D.Tenn.1962) ("There could not be any issue between the TVA and the FmHA, both being the United States, that this court could litigate or adjudicate...."), on the basis of *Nixon:*

> "The mere assertion of a claim of intrabranch dispute, without more, has never operated to defeat federal jurisdiction; justiciability does not depend on such a surface inquiry. In *United States v. ICC*, 337 U.S. 426 [69 S.Ct. 1410, 93 L.Ed. 1451] (1949), the Court observed, 'courts must look behind the names that symbolize the parties to determine whether a justiciable case or controversy is presented.'"

*Dean*, 668 F.Supp. at 651 (quoting *Nixon*, 418 U.S. at 693, 94 S.Ct. at 3100). Although this court agrees with the district court's conclusion, it is not the law of the case, and this court takes the opportunity to amplify the discussion.

Section 4 of the Tennessee Valley Authority Act of 1933, 16 U.S.C. § 831c(b) (1982) (the "TVA Act"), provides that TVA "may sue and be sued in its corporate name." TVA's identity as an entity independent of the federal government was resolved by the Supreme Court in *Pierce v. United States*, 314 U.S. 306, 62 S.Ct. 237, 86 L.Ed. 226 (1941). *Pierce* involved the criminal charge of "falsely assum[ing] or pretend[ing] to be an officer or employee acting under the authority of the United States, or any Department, or any officer of the Government thereof," 314 U.S. at 306, 62 S.Ct. at 237, against a newspaper editor who sold "T.V.A. Units." The Supreme Court held that TVA did not fall within this statute and that the conviction for false pretenses could not stand. *Id.* at 309–10, 62 S.Ct. at 238–39. Clear error was found because the lower court did not instruct the jury that "TVA, although an instrumentality of the Federal Government, is a corporate entity, separate and distinct from the Federal Government...." *Id.* at 310, 62 S.Ct. at 239. Defendant's reliance on *United States ex rel. TVA v. Easement & Right of Way*, 204 F.Supp. 837, is misplaced because the case was a condemnation suit, and any real property acquired by TVA must be taken in the name of the United States. TVA Act §§ 4,

25, 16 U.S.C. §§ 831c(h), 831x. All other property has been found to be taken directly in TVA's name. *See United States v. General Elec. Co.,* 209 F.Supp. 197, 206 (E.D.Pa.1962).[8] *TVA v. Kinzer,* 142 F.2d 833 (6th Cir.1944), is distinguishable since the court held that TVA is "plainly a governmental agency or instrumentality of the United States," 142 F.2d at 837, in the context of making benefits of federal employment applicable to TVA employees. As Judge Jarvis of the Eastern District of Tennessee concluded, the parties possess separate legal identities, and "TVA's unique independence as a federal agency sharpens this adverseness." *Dean,* 668 F.Supp. at 652 (footnote omitted).

Defendant reads *Nixon* to support solely the proposition that if the President cannot control the Executive or administrative entity, only then can the judiciary intercede. Although the regulation in *Nixon* specifically withheld removal power from the President regarding the Special Prosecutor's office, *Nixon,* 418 U.S. at 694, 94 S.Ct. at 3100, the focus of the Court was on the nature of the controversy:

> The demands of and the resistance to the subpoena present an obvious controversy in the ordinary sense, but that alone is not sufficient to meet constitutional standards. In the constitutional sense, controversy means more than disagreement and conflict; rather it means the kind of controversy courts traditionally resolve.... The independent Special Prosecutor with his asserted need for the subpoenaed material in the underlying criminal prosecution is opposed by the President with his steadfast assertion of privilege against disclosure of the ma-

terial. This setting assures there is "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions."

418 U.S. at 696–97, 94 S.Ct. at 3102 (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)).

*United States v. ICC,* 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949), and *United States v. FMC,* 694 F.2d 793 (D.C.Cir. 1982), are also described as inapposite by defendant. In *United States v. ICC,* the United States, as a shipper, challenged the ICC's determination that railroads had exacted illegal rates from the Government. Although the Supreme Court mentioned the railroads as the real parties in interest, 337 U.S. at 432, 69 S.Ct. at 1414, the Court was persuaded that a real controversy existed between the United States suing as a shipper and the United States defending the ICC's order. The court in *United States v. FMC* allowed the United States to challenge an order of the Federal Maritime Commission approving an expired rate agreement.

Defendant states that the heads of both the ICC and FMC, like the Office of Special Prosecutor in *Nixon,* do not serve at the pleasure of the President, so that their actions were beyond the control of the Executive and the disputes then could be resolved by the judiciary. Thus, defendant argues, TVA, whose head serves at the pleasure of the President, should look to the Executive for resolution. Additionally, it is argued that the ICC and FMC, unlike TVA, possess regulatory authority over ac-

---

8. Defendant was handed a good argument, albeit of the straw man variety, because the district court in *Dean* read *United States ex rel. TVA v. Easement & Right of Way* as categorizing a dispute between TVA and FmHA as a non-justiciable interagency dispute. This allowed defendant to avoid the factual distinction that *United States ex rel. TVA v. Easement & Right of Way* involved a condemnation suit that by statute TVA was required to maintain in the name of the United States. Incident to the condemnation action, TVA sought to enjoin FmHA as a security holder in the land TVA sought to acquire. The district court in *Dean* was not per-

suaded that the action amounted to a United States v. United States lawsuit due to the condemnation statute, but read *Nixon,* as well as the earlier Supreme Court decision in *United States v. ICC,* 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949), and *United States v. FMC,* 694 F.2d 793 (D.C.Cir.1982), as casting doubt on the validity of the holding in *United States ex rel. TVA v. Easement & Right of Way.* Defendant thus could observe fairly that these cases do no such thing. The solution is to distinguish *United States ex rel. TVA v. Easement & Right of Way* on its facts, as plaintiff proposes.

tivities that are carried out by both public and private entities. Defendant is wrong on both counts. First, the leadership of both ICC and FMC is chosen by the President. *See* Act of 1887 ch. 104 § 11, 24 Stat. 379, 383 (1887) (codified as amended at 49 U.S.C. § 10301 (1982) (Interstate Commerce Commission); Reorg. Plan No. 7 of 1961, § 102, 75 Stat. 840 (1961) (Federal Maritime Commission). Second, if defendant rests its distinction of these cases upon the regulatory power of these agencies reaching public and private entities, it should be noted that TVA's independent ratemaking function has been exercised with respect to both public and private entities since TVA's inception.

The dispute between TVA and DOE is not illusory. TVA has a separate corporate identity, TVA Act, § 4, 16 U.S.C. § 831c, and possesses the power to enter into binding contracts for the provision "of electric utility services." 42 U.S.C. § 2204 (1982). This contractual authority is not limited to TVA's contracts with ratepayers other than DOE. TVA also has the authority to sue for enforcement of its contracts, and its litigation authority is independent of the Department of Justice. TVA Act, § 4(b), 16 U.S.C. § 831c(b). The Supreme Court in both *Nixon* and *ICC* looked beyond names and relationships to determine whether the issues were of "a type which are traditionally justiciable." *United States v. Nixon*, 418 U.S. at 697, 94 S.Ct. at 3095; *United States v. ICC*, 337 U.S. at 430, 69 S.Ct. at 1413. This court follows that standard.

### 4. *Exec. Order No. 12,146*

The district court in *Dean* also held that section 1–402 of Exec. Order No. 12,146, establishing both suggested and mandatory review by the Attorney General of claims between Executive agencies, was inapplicable. Exec. Order No. 12,146, 3 C.F.R. 409 (1979), provides, in pertinent part:

1–4. *Resolution of Interagency Legal Disputes.*
1–401. Whenever two or more Executive agencies are unable to resolve *a legal dispute between them*, including the question of which has jurisdiction to administer a particular program or to regulate a particular activity, each agency is encouraged to submit the dispute to the Attorney General.
1–402. *Whenever two or more Executive agencies whose heads serve at the pleasure of the President are unable to resolve such a legal dispute, the agencies shall submit the dispute to the Attorney General prior to proceeding in any court, except where there is specific statutory vesting of responsibility for a resolution elsewhere.*

(Emphasis added).

Plaintiff asserts that the district court's determination regarding the application of the Executive Order is law of the case, arguing that this conclusion of law was essential to reach the transfer decision. Law of the case effect can be denied in "exceptional circumstances." *Gindes*, 740 F.2d at 949. An exception is permitted where the prior decision "[is] clearly erroneous, and would work a substantial injustice...." *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 657 (Fed.Cir.) (quoting *Central Soya Co. v. George A. Hormel & Co.*, 723 F.2d 1573, 1580–81 (Fed.Cir.1983)), *cert. denied*, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985)). " 'A mere suspicion of error, no matter how well supported, does not warrant reopening an already decided point.' " *Gindes*, 740 F.2d at 950 (quoting *Northern Helex Co. v. United States*, 225 Ct.Cl. 194, 201, 634 F.2d 557, 562 (1980) (citations omitted)); *accord Central Soya*, 723 F.2d at 1580.

The district court in its short discussion concluded that Exec. Order No. 12,146 did not apply on two grounds. The primary ground was the court's impression that the Executive Order, entitled "Management of Federal Legal Resources," was designed solely "to coordinate the legal resources of the numerous federal agencies represented in litigation by the Justice Department." *Dean*, 668 F.Supp. at 653. Since TVA has actual control over its litigation to the exclusion of the Attorney General, the district court held that the Executive Order had no application. *Dean, id.* at 653 (citing *Alger*

*non Blair Indus. Contractors, Inc. v. TVA,* 540 F.Supp. 551 (M.D.Ala.1982)). Secondarily, the court, observing that the Executive Order created a Federal Legal Council, noted that "TVA was not one of the 15 initial members ... nor is it claimed by DOE that TVA has ever been a member...." *Dean,* 668 F.Supp. at 652.

Following the Federal Circuit's admonition that the decisions generated during a claim's history should be respected absent a decision that is "clearly erroneous" and where such deference "would work a substantial injustice," *Kori Corp.,* 761 F.2d at 657, the court respectfully submits that the district court's decision on point should not be given effect as law of the case. The plain wording of the Executive Order contradicts the district court's reading. Although the Executive Order does create a Federal Legal Council, its membership is not a listing of agencies that are subject to the order. Section 1–101 states that the Federal Legal Council "shall be composed of the Attorney General and the representatives of not more than 15 other agencies." The "initial membership" of the Council is delineated in section 1–102 of the order. Council members serve for a two-year term, "and at least five positions on the Council ... rotate annually." § 1–103. Moreover, "[r]epresentatives of agencies that are not members of the Council may serve on or chair subcommittees of the Council." § 1–105.

The functions listed for the Federal Legal Council in section 1–201 include promoting "(a) coordination and communication among Federal legal offices." Section 1.301 provides for notice of litigation covering "all civil litigation pending in the courts in which the Federal Government is a party or has a significant interest." "All Agencies with authority to litigate cases in court shall promptly notify the Attorney General about those cases that fall in classes or categories designated from time to time by the Attorney General." § 1–302(a). The district court's correct conclusion that TVA possesses independent litigation authority is not diminished by the fact that the Executive Order attempts to coordinate federal interagency litigation resources and to re-solve disputes before court action is commenced.

Erroneous determinations still can be given effect absent manifest injustice. The manifest injustice component of the exception requires, at a minimum, a showing that alleged error was not actually beneficial to the objecting party. *See Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 901 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984). In *Christianson v. Colt Indus. Operating Corp.,* 822 F.2d 1544 (Fed.Cir. 1987), the Federal Circuit accepted retransfer of a case from the Seventh Circuit after the Federal Circuit earlier had transferred it to the Seventh Circuit, even though the retransfer decision was "clearly wrong." 822 F.2d at 1551 n. 7. Discussing the interest of justice in terms of the transfer statute, rather than law of the case doctrine, the Federal Circuit stated:

> A third transfer would subject the parties to a continuation of the back-and-forth battering they have experienced to date, and nothing would preclude the Seventh Circuit from ordering a fourth transfer, this court a fifth, etc. It would not therefore be in the interest of justice to again transfer the appeal to the Seventh Circuit.

*Id.* at 1560.

■ Manifest injustice is presented on the facts of this case. If this court proceeded to adjudicate TVA's claim, the Executive branch would lose the benefit of the administrative dispute resolution process provided for in Exec. Order No. 12,146. A court must be mindful of administrative remedies whether they be created by mandate of Congress or the President. Although the case before the court is a justiciable contract claim, policy questions within the Executive's purview are implicated. Whatever TVA's functional or financial independence from the Federal Government, it is uncontested that TVA was established "in the interest of the national defense," as well as for other purposes that the Federal Government promotes, such as agricultural and industrial development. TVA Act § 1, 16 U.S.C. § 831. If the matter can be

resolved as a matter of Administration policy—since, as will be discussed, TVA's board serves at the pleasure of the President—it is altogether appropriate to dejudicialize the dispute and allow the Executive an opportunity to act.

Having determined that the Executive Order is applicable, the next inquiry is whether the mandatory or permissive language of the order applies to plaintiff. Section 1–402 of Exec. Order No. 12,146 requires submission to the Attorney General if the agency "heads serve at the pleasure of the President" and are unable to reserve a legal dispute. Plaintiff, in its lengthy brief, reiterates that TVA independently controls its litigation in this court. The Federal Circuit in *Cooper v. TVA*, 723 F.2d 1560 (Fed Cir.1983), confirmed the independent right of TVA to represent itself in litigation:

> [T]he Courts Improvement Act was not intended to change the existing authority of TVA "to represent itself by attorneys of its choosing." The House committee report stated that this provision, then section 307, H.R. 4482, 97th Cong., 1st Sess. (1981), "provides that the proposed legislation will not change the provisions of existing law concerning the legal representation of the TVA before any court of the United States." H.R.Rep. No. 312, 97th Cong., 1st Sess. 30 (1981). Similarly, the Senate committee report explained that the provision, then section

168, S. 1700, 97th Cong., 1st Sess. (1981), "makes clear that nothing in this Act affects the authority of the Tennessee Valley Authority to represent itself by attorneys of its choosing." S.Rep. No. 275, 97th Cong., 1st Sess. 25 (1981), U.S. Code Cong. & Admin.News 1982, pp. 11, 35.

723 F.2d at 1563. Plaintiff misapplies *Cooper* and the legion of cases discussing the status of an agency based on independent control of litigation. That TVA has independent litigating authority does not mean that the two agencies cannot be subject to a nonbinding administrative review.[9]

Plaintiff next asserts that responsibility for resolving the dispute has been vested in TVA since its ratemaking authority is insulated from judicial review:

> The Tennessee Valley Authority Act authorizes the Board of Directors of the Authority to fix the rates at which the electric energy generated at the dams authorized by the Tennessee Valley Authority Act may be sold. The statute vests discretion in the board in fixing such rates, and the exercise of this discretion is not subject to judicial review.

*Mobile Oil Corp. v. TVA*, 387 F.Supp. 498, 508 (N.D.Ala.1974); *see Consolidated Aluminum Corp. v. TVA*, 462 F.Supp. 464, 474 (M.D.Tenn.1978). These rate cases, although possibly relevant to determine the legality of defendant's alleged breach,[10] do

**9.** Defendant argues that the Constitution commits resolution of the TVA and DOE's dispute to the Executive and that Exec. Order No. 12,146 by section 1–402 represents the Executive's delegation to the Attorney General. From this defendant argues that the Executive Order confirms the nonjusticiability of this controversy since its resolution has been delegated within the Executive. The problem with this approach is that the Executive Order does not read as defendant wishes. "[P]rior to proceeding in any court," § 1–402, a dispute between Executive agencies whose heads serve at the pleasure of the President must be submitted to the Attorney General. In most circumstances involving actions by or against third parties, the Attorney General's resolution will be the final word as to the Government's position advanced in court in respect of the third parties. However, where the question is not which agency position will be put before a court, but the rights and liabilities of one agency in respect of the other, the

issue becomes one of justiciability. The Attorney General's resolution will stand unless a dissatisfied agency can persuade the court that the dispute is justiciable.

Defendant also argues that because the Executive Order makes interagency disputes referable to the Attorney General, they are nonjusticiable. According to defendant, the law recognizing justiciability of appropriate interagency disputes is usurped since the Executive has interposed a dispute resolution process on the way to the courthouse. Exec. Order No. 12,146 cannot displace the precedent that requires justiciability determinations to be resolved by examining the real parties in interest and the nature of the controversy.

**10.** The court accepts defendant's characterization of the nature of the suit as interpretation of the parties' obligations under the contracts, not, as plaintiff argues, defendant's attempt to usurp TVA's ratemaking authority.

not speak specifically to the issue of the President's removal power.

The Sixth Circuit, whose bailiwick includes TVA's operations, previously passed on this question in *Morgan v. TVA*, 115 F.2d 990 (6th Cir.1940), *cert. denied*, 312 U.S. 701, 61 S.Ct. 806, 85 L.Ed.2d 1135 (1941). In *Morgan* appellant, the former chairman of TVA who had been removed from the position by the President, sought a declaratory judgment that his removal was unlawful. Rejecting TVA's position that its ratemaking power is quasi-legislative and therefore that its board members do not serve at the pleasure of the President, the court explained:

> Many of these activities, prior to the setting up of the T.V.A., have rested with the several divisions of the executive branch of the government. True, it is, that in executing these administrative functions, the Board of Directors is obliged to enact by-laws, which is a legislative function, and to make decisions, which is an exercise of function judicial in character. In this respect its duties are, in no wise, different, except perhaps in degree, from the duties of any other administrative officers of agencies, or the duties of any other Board of Directors, either private or public. Whatever their character, they are but incidental to the carrying out of a great administrative project. The Board does not sit in judgment upon private controversies, or controversies between private citizens and the government, and there is no judicial review of its decisions, except as it may sue or be sued as may other corporations....

115 F.2d at 994. Plaintiff would distinguish *Morgan* on the basis that the removal was for cause, so that the head of TVA does not serve at the pleasure of the president, citing *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). To the contrary, *Morgan* held that the President's removal power could be exercised either with or without cause, that the President could exercise this power even though TVA's board serves fixed terms, and that "[t]he rule of the Humphrey case does not apply." *Morgan*, 115 F.2d at 994. Defendant aptly points out that the President may not remove the TVA board at whim, but need not satisfy specific criteria for cause.

*Morgan* characterized TVA as "predominantly an administrative arm of the executive department." 115 F.2d at 994. However, plaintiff contends that the 1941 decision has lost context because of intervening changes in TVA's authority, specifically the TVA Act, § 15d, Pub.L. No. 86–137 § 1, 73 Stat. 280 (1959) (codified at 16 U.S.C. § 831n–4), by which TVA became self-financing through its power revenues. According to plaintiff, if doubt existed before, TVA is now performing a quasi-legislative function and the function must be purely executive to bring TVA within the ambit of the Executive branch. The premise of *Morgan* was that TVA had taken over substantial functions traditionally performed within the Executive branch and had quasi-legislative and judicial functions, as well. Enhancement of its quasi-legislative functions does not change the nature of TVA or displace *Morgan*'s recognition of its other functions.

Even if plaintiff were technically correct that TVA is a creature apart from the "Executive agencies" subject to Exec. Order No. 12,146, a strong policy argument persuades that TVA should be considered within the umbrella of the Executive Order. The Order establishes a clearing house for the Government's work product. The economies and concomitant reduction in legal expenses promoted by the Executive Order cannot be gainsaid. It makes no sense—from the perspective of promotion of uniform government litigation policy—to exclude TVA from participating in the benefits of the Executive Order, which apply to all Executive agencies with independent authority to litigate. On this basis TVA failed to win an exemption from the Executive Order when it was promulgated. Moreover, the Attorney General has the opportunity to head off litigation that emanates from agencies led by officials removable at the pleasure of the President. Since TVA is such an agency, the policy should reach TVA.

### 5. *Contract action*

■ Defendant's final resistance to plaintiff's proceeding in this court is the argument that the Oak Ridge and Paducah contracts are not true contracts. First, defendant attempts to resuscitate its argument that TVA and the United States are one entity. Previously discussed were TVA's separate existence and power to contract with the Government. In fact, TVA's contracts with DOE at issue in the case were reviewed by Congress in the same manner as TVA's contracts with private ratepayers. On the record thus far presented, the court cannot accept defendant's characterization of the subject contracts as between the United States and the United States. Second, defendant argues that Congress has the power to reform or even abrogate the parties' contracts and is attempting to take such action under a Senate bill. This argument is premature and can be resolved in connection with plaintiff's motion for summary judgment. Plaintiff will be allowed to press its claim before the Attorney General and, if necessary, before this court.

### CONCLUSION

Based on the foregoing,

IT IS ORDERED, as follows:

1. Defendant's motion to dismiss for lack of subject matter jurisdiction is denied.

2. Pursuant to RUSCC 60.1(a), this case is suspended to February 29, 1988, in order for TVA and DOE to submit their dispute to the Attorney General of the United States and to obtain his resolution of their dispute. The Attorney General shall issue his decision, which shall be transmitted to this court, by February 16, 1988. Defendant has represented that the Attorney General will render a decision and not await action by the Senate. The February 16 date shall not be extended.

3. The parties shall file a Status Report by February 29, 1988, advising whether the administrative resolution is satisfactory. If a satisfactory administrative resolution is not reached, defendant shall file its answer on March 1, 1988, and a status confer-ence shall be held at 1:00 p.m. on Friday, March 4, 1988, at which time plaintiff's motion for expedited consideration of its dispositive motion will be granted and a schedule set for further proceedings *de novo*.