TENNESSEE VALLEY AUTHORITY,
Petitioner,

Georgia Power Company, Intervenor,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, John H. Hankinson, Jr., Regional Administrator, et al., Respondents.

Alabama Power Company, Duke
Energy Corporation,
Petitioners,

Georgia Power Company, Intervenor,

v.

United States Environmental Protection Agency, John H. Hankinson, Jr., Regional Administrator, et al., Respondents.

Tennessee Valley Authority, Petitioner,

Georgia Power Company, Intervenor,

v.

United States Environmental Protection Agency, John H. Hankinson, Jr., Regional Administrator, et al., Respondents.

Tennessee Valley Authority, Petitioner,

Georgia Power Company, Intervenor,

v.

United States Environmental Protection Agency, John H. Hankinson, Jr., Regional Administrator, et al., Respondents.

Alabama Power Company, Duke
Energy Corporation,
Petitioners,

Georgia Power Company, Intervenor,

v.

United States Environmental Protection Agency, John H. Hankinson, Jr., Regional Administrator, et al., Respondents.

Tennessee Valley Authority, Petitioner,

Georgia Power Company, Intervenor,

v.

United States Environmental Protection Agency, John H. Hankinson, Jr., Regional Administrator, et al., Respondents.

Tennessee Valley Authority, Petitioner,

v.

Christine Todd Whitman, Administrator, United States Environmental Protection Agency, United States Environmental Protection Agency, Respondents.

Alabama Power Company, Petitioner,

v.

Christine Todd Whitman, Administrator, United States Environmental Protection Agency, United States Environmental Protection Agency, Respondents.

Tennessee Valley Public Power Association, Memphis Light, Gas & Water Division, Electric Power Board of Chattanooga, et al., Petitioners,

v.

Christine Todd Whitman, Administrator, United States Environmental Protection Agency, United States Environmental Protection Agency, Respondents.

Duke Energy Corporation, Petitioner,

v.

Christine Todd Whitman, Administrator, United States Environmental Protection Agency, United States Environmental Protection Agency, Respondents.

Nos. 00–12310, 00–12311, 00–12349, 00–12457 to 00–12459, 00–15936 and 00–16234 to 00–16236.

United States Court of Appeals, Eleventh Circuit.

Jan. 8, 2002.

J. Robin Rogers, Frederick Ladd Hitchcock, Timothy H. Nichols, Carlos Clifford Smith, Mark Windhorn Smith, Strang, Fletcher, Carriger, Walker, Hodge & Smith, Chattanooga, TN, James E. Fox, Robert Chester Glinski, Harriet A. Cooper, Gregory R. Signer, Ronald E. Klipsch, James B. Hall, TVA, Office of General Counsel, Knoxville, TN, Makram B. Jaber, F. William Brownell, Henry V. Nickel, Hunton & Williams, Washington, DC, Melvin Scott Schulze, Hunton & Williams, Atlanta, GA, for TVA.

James C. Cope, Murfree, Cope, Hudson & Scarlett, Murfreesboro, TN, David Gualtieri, J. Steven Rogers, Environmental & Natural Resources Div., Environmental Defense Section, U.S. Dept. of Justice, Washington, DC, for EPA.

Wiliam H. Lewis, Jr., Morgan, Lewis & Bockius, LLP, Washington, DC, for American Forest & Paper Ass'n, Amicus Curiae.

David R. Wooley, Young, Sommer, Ward, Ritzenbert, Wooley, Baker & Moore, LLC, Albany, NY, for Southern Alliance for Clean Energy, Amicus Curiae.

Margaret Campbell, Ogletree, Deakins, Nash, Smoak & Stewart, Atlanta, GA, Eugene W. Ward, General Counsel, Electric Power Bd., Nashville, TN, J. Maxwell Williams, Memphis, TN, Henry C. Tharpe, Jr., Kinney, Kemp, Pickell, Sponcler & Joiner, Dalton, GA, Benjamin Franklin Johnson, IV, Hunton & Williams, Daniel S. Reinhardt, Marshall B. Dukes, Troutman Sanders, Atlanta, GA, Karl R. Moor, Washington, DC, Peter Crane Anderson, Hunton & Williams, Charlotte, NC, for Intervenor, Georgia Power Co.

Angelia Souder Blackwell, Atlanta, GA, for Whitman and EPA.

Karl R. Moor, Southern Co., Washington, DC, Steven G. McKinney, Michael D. Freeman, Lyle David Larson, R. Bruce Barze, Jr., for Alabama Power Co. Balch & Bingham, Birmingham, AL, for Alabama Power Co.

J. Maxwell Williams, Memphis Light, Ga & Water Div., Memphis, TN, for Memphis Light, Gas & Water Div.

Garry Stephen Rice, Duke Energy Corp., T. Thomas Cottingham, Hunton & Williams, Charlotte, NC, for Duke Energy Corp.

Before TJOFLAT, BARKETT and WILSON, Circuit Judges.

BARKETT, Circuit Judge:

Pursuant to the Clean Air Act (CAA), 42 U.S.C. § 7607(b), the Tennessee Valley Authority (TVA), joined by a number of private power companies and industry associations, petitions for review of three orders issued to it by the Environmental Protection Agency (EPA).[1] Centrally at

---

**1.** The first is an Administrative Compliance Order (ACO) issued on November 3, 1999, and last amended on April 10, 2000. The second is a Reconsideration Notice issued on May 4, 2000, in which EPA agreed to review and reconsider the ACO, but stated that the

issue in these orders is EPA's determination that certain maintenance and repair projects conducted by TVA at many of its coal-fired power plants in the past twenty years constituted "modifications" that required TVA to obtain pre-construction permits and to bring the plants into compliance with the more stringent emissions limitations that apply to new facilities. The challenged orders therefore require TVA to obtain these permits after the fact, and to install the mandated pollution control devices at all the "modified" plants. In response to EPA's determination, TVA principally argues that the maintenance it conducted at its plants was "routine," and as such, is statutorily exempted from the requirements that apply to "modifications." TVA contends that EPA's orders rely on a new and different interpretation of "routine," and that its attempt to apply that interpretation retroactively deprived TVA of fair notice. It also challenges the methodology by which EPA determined whether TVA's projects at the power plants resulted in an emissions increase. Arguing that EPA's determination was arbitrary, capricious, and contrary to law, TVA seeks to have the orders set aside.

EPA has filed a number of motions to dismiss, arguing that for various reasons this Court lacks subject matter jurisdiction to review the dispute between EPA and TVA. EPA has also moved to dismiss all parties other than TVA on the ground that they lack standing to challenge orders that were not issued, and do not apply, to them. Since these are threshold challenges, we must address them first in order to determine whether we may consider the merits of the petitions before us. We held oral argument to consider preliminarily only these motions and we resolve them here. While a number of EPA's challenges present complex and close questions, ultimately we are not persuaded that we lack jurisdiction to review the orders issued to TVA, nor that the private petitioners lack standing.

## BACKGROUND

At this juncture, we confine ourselves to a brief statement of the facts and procedural history relevant to EPA's challenges to this Court's jurisdiction over the petitions that have been filed in the case. This action concerns a dispute arising under the CAA, 42 U.S.C. §§ 7413, 7477. Since one of the goals of the CAA is to prevent increases in air pollution resulting from modifications made to existing sources of pollutants, such as power plants, under the Act's New Source Performance Standards (NSPS) and New Source Review (NSR) programs, an existing source of pollutants is required to obtain a permit before it makes any such pollution-increas-

---

ACO would remain in effect while the review process took place. The third is a Final Order on Reconsideration issued by EPA's Environmental Appeals Board (EAB) on September 15, 2000, in which the EAB sustained most of the original Compliance Order. For the purposes of our review, we have consolidated ten separate petitions arising in two cases relating to the three orders. The first case, *TVA I*, encompasses the petitions seeking review of the first two orders. Joining TVA (nos. 00–12310 and 00–12459) in that case are the Alabama Power Company (APC) (nos. 00–12311 and 00–12458), Duke Energy Corporation (Duke) (nos. 00–12311 and 00–12458), Tennessee Valley Public Power Association (TVPPA) (nos. 00–12349 and 00–12457), and, as an intervenor in all the petitions, the Georgia Power Company (GPC). The second case, *TVA II*, challenges the EAB decision. TVA is joined in that case by APC (no. 00–16234), Duke (no. 00–16236), TVPPA (no. 00–16235), and Memphis Light, Gas & Water Division, Electric Power Board of Chattanooga, Middle Tennessee Electric Membership Corporation, North Georgia Electric Membership Corporation, and Volunteer Electric Cooperative (no. 00–16235).

ing modifications.[2] TVA, a corporate agency and instrumentality of the United States, 16 U.S.C. § 831, owns and operates eleven coal-fired electrical power generating plants. At the heart of this dispute is EPA's contention that in the past two decades TVA undertook fourteen projects at nine of these coal-fired plants without first obtaining the required permits. As noted, TVA argues that its modifications constituted "routine" maintenance, repairs, or replacements that are statutorily exempt from NSPS and NSR regulation.[3] It also challenges the method EPA employed to determine whether its projects at the plants in question resulted in emissions increases.

On November 3, 1999, EPA issued an Administrative Compliance Order (ACO) to TVA, pursuant to §§ 113(a) and 167 of the CAA, 42 U.S.C. §§ 7413(a) and 7477 (1999). The ACO contained findings that TVA's "modifications" of several of its operating plants violated certain provisions in the CAA, and did not fall under any regulatory exemptions. The ACO directed TVA to take numerous remedial measures pursuant to the CAA, including (i) proposing a reasonable schedule for obtaining permits and installing pollution controls that allegedly should have been installed when the modifications were constructed, and (ii) providing an audit of its other construction activities to identify any additional unpermitted modifications. The ACO stated that "[f]ailure by TVA to comply with ... [this] order may result in administrative action for appropriate relief including civil penalties, as provided in [§] 113 of the Act, 42 U.S.C. § 7413." At a conference on December 20th and by subsequent letter, TVA notified EPA of its objections to the ACO and indicated its intention to seek review of the Order in this Court if EPA did not withdraw it. TVA filed a petition in this Court for review of the November 3rd ACO, as amended, on May 4th, 2000. Also petitioning for review of the ACO are Alabama Power Company (APC), Duke Energy Corporation (Duke), and the Tennessee Valley Public Power Association (TVPPA).

In response to TVA's earlier request to reconsider the ACO and to withdraw or stay it, the Regional Administrator of the EPA issued a letter on May 4th, 2000—the same day TVA filed its petition in this Court—granting reconsideration of the ACO, but indicating that the Order, which was to have taken effect on March 6, 2000, would remain in effect during the review process, and expressing the expectation that TVA would comply with its conditions. In its letter, EPA stated that then-Administrator Browner had directed the Environmental Appeals Board (EAB) to conduct reconsideration proceedings and to render a decision by September 15, 2000 with findings of fact and conclusions of law. TVA, APC, Duke, and TVPPA then filed a petition for review of EPA's May 4th letter refusing to withdraw the ACO or

---

**2.** A "major modification" is defined as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emissions increase of any pollutant subject to regulation under the Act." 40 C.F.R. § 52.21(b)(2)(i).

**3.** A central disagreement between TVA and EPA is whether "routine" should be defined relative to an industrial category or to a particular unit. TVA contends that a mainte-nance or replacement project that may need to be undertaken only once or twice during the life of a particular unit—and so in that sense is not routine—is nonetheless routine within the industrial category, since it has to be done once or twice within the life of every such unit. According to TVA, EPA formerly used the "industrial category" as the baseline and is now treating the individual unit as the frame of reference instead.

to stay it pending the reconsideration proceedings.

The May 4th Letter set forth a schedule for conducting the EAB review process. It provided:

(1) by no later than May 31, 2000, EPA will provide to TVA a core set of documents relevant to the Order and the issues set forth by TVA on December 20, 1999; (2) between the date of this letter and June 30, 2000, TVA and EPA enforcement staff may exchange document requests and interrogatories, and take depositions of persons who may have information relevant to the factual and legal issues surrounding the Order; (3) on or about July 15th, a hearing no longer than six days shall occur to adduce relevant oral testimony; and (4) no later than July 31st, the parties shall proffer documents and hearing transcripts that form the basis of their legal and factual arguments as well as legal memoranda in support of their claims.

The Administrator selected three members of the EAB to conduct the review. The EAB then asked an Administrative Law Judge (ALJ) to supervise discovery and hold an evidentiary hearing to develop a record for the EAB's review; however, the ALJ was not asked to make any findings of fact or conclusions of law. The EAB issued its decision on September 15, 2000, determining that EPA had either abandoned or failed to prove roughly half of the allegations of the ACO, but that it had proved the remainder of the alleged violations. It found at least one violation at all but one of the plants that had been cited in the ACO, rejecting TVA's argument that the projects at the plants constituted "rou-

tine maintenance" and that TVA lacked fair notice of EPA's interpretation of "routine." Finally, it sustained the remedies sought by EPA, although it vacated the surrender of $SO_2$ allowances as premature and stated that the determination of what pollution controls will be required under the permits must be made on a case-by-case basis by the applicable permitting authority. TVA then petitioned for review of the EAB decision in this Court.[4] This case consolidates all the petitions that have been filed in response to the three orders issued to TVA by EPA.[5]

## DISCUSSION

The Department of Justice, on behalf of EPA, has asserted that this Court lacks subject matter jurisdiction to hear the petitions in this case. It argues that (a) the issuance of the EAB decision rendered moot all petitions relating to earlier orders issued by EPA; (b) TVA lacks independent authority to conduct this litigation over the opposition of the Attorney General; (c) there is no justiciable case or controversy because both EPA and TVA are executive branch agencies whose leaders serve at the pleasure of the President; (d) the EAB decision is not a reviewable final order; (e) the EAB decision is not ripe for judicial review because TVA has not first submitted the dispute to the Attorney General for resolution as required by Executive Order; and (f) the petitioners other than TVA, none of whom received the challenged orders from EPA nor is subject to them, lack standing to petition this Court for review.

We first dispose of matters regarding the ACO and the May 4th Letter. We

4. In addition to TVA, several other parties separately filed petitions for review of the EAB decision. *See supra* note 1.

5. Before the petitions were consolidated, TVA moved to intervene in 00–16234, 00–16235, and 00–16236. Since the petitions have now been consolidated, this motion is denied as moot.

then consider the interrelated arguments relating to the EAB's decision. Finally, we consider the standing issue relating to petitioners other than TVA.

## A. Mootness: The Effect of the EAB Decision on the ACO and the May 4th Letter

■ Although we have carried with the case EPA's motions to dismiss on the ground that the ACO and the May 4th Letter are not reviewable because they are not final agency actions, EPA now argues that TVA's petitions to set aside the ACO and the May 4th letter are moot, since the subsequent EAB decision supplants the ACO. EPA therefore argues that, if there is any reviewable agency action at all, it is only the EAB decision, because that is the only ruling to which TVA remains subject. Initially, TVA argued that the EAB decision did not withdraw or supercede the ACO, but simply "sustained" it. APC EAB Brief at 34–35.[6] For two reasons it urged us to set aside the EAB decision and review the ACO on the administrative record certified to this Court on June 15, 2000. First, it argued that the EAB decision is EPA's litigation position, a post hoc rationalization for an order that was already final, and that it is therefore not entitled to any deference but instead should be viewed "critically." Second, TVA argued that the EAB's review process violated "basic concepts of fair play" and therefore, under the APA, should be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). At oral argument, however, TVA conceded that its position with regard

to the ACO and the May 4th letter was simply protective, in the event the EPA sought to enforce any provisions contained therein and not contained in the EAB final decision. All parties at oral argument agreed that the only viable order in this cause is the EAB final decision of September 15, 2000 and that the ACO and May 4th letter are of no further force or effect. Accordingly, we conclude that, in light of the final decision of the EAB, the ACO and May 4th letter are moot.[7] We therefore turn to EPA's various arguments asserting that we lack jurisdiction to review the EAB's final decision.

## B. TVA's Independent Litigating Authority

■ EPA argues that TVA lacks independent litigating authority to bring this action over the opposition of the Attorney General. However, EPA has cited no case, and we are aware of none, that can support its position. Since its inception in 1933, TVA has represented itself in litigation by attorneys of its own choosing. Moreover, on three separate occasions, TVA conducted litigation over the objections of the Attorney General, and in all three cases the courts found that TVA had independent litigating authority under the TVA Act. See Dean v. Herrington, 668 F.Supp. 646 (E.D.Tenn.1987); Cooper v. TVA, 723 F.2d 1560 (Fed.Cir.1983); Algernon Blair Indus. Contractors, Inc. v. TVA, 540 F.Supp. 551 (M.D.Ala.1982). In Algernon Blair, the Attorney General moved to strike the appearance of TVA's attorneys and to substitute attorneys from the Department of Justice. As in the present

---

6. Some of the arguments are made by APC in its brief, rather than by TVA, but to avoid further complicating an already complicated discussion, and since all the petitioners have adopted each other's briefs, we will continue to refer to TVA.

7. Petitions 00–12310, 00–12311, 00–12349, 00–12457, 00–12458, and 00–12459 are thus dismissed as moot. EPA's motions to dismiss those petitions are denied as moot.

case, DOJ pointed to 28 U.S.C. § 519, which provides that "except as otherwise authorized by law, the Attorney General shall supervise all litigation to which the United States, an agency, or officer thereof is a party...." 540 F.Supp. at 552 (quoting 28 U.S.C. § 519). The court nonetheless clearly rejected DOJ's position:

> [T]he Court is of the opinion that although the language of the TVA Act conferring independent litigation authority, standing alone, is arguably subject to differing constructions, the history of the establishment of TVA, the actions of Congress, and the actions of the Department of Justice over the forty-nine year history of the Act seem to compel the conclusion that the correct interpretation is that the language of the Act does confer independent authority on TVA.

*Id.* at 556. The court observed that Congress has repeatedly recognized TVA's responsibility for its own litigation. For example, in a 1938 Congressional investigation into TVA's defense in several early court proceedings challenging its constitutionality, the investigating committee wrote that TVA, "unlike ordinary Government departments, has no statutory right to demand legal assistance from the Department of Justice." *Id.* at 554. Similarly, the court observed that the legislative history of the Contracts Disputes Act of 1978 acknowledges that "because the Tennessee Valley Authority handles its own litigation, its attorneys, rather than the Attorney General, will enforce its rights under [the fraud section of the Act.]" *Id.* at 555. The court also noted that, "prior to this case, the position of the Department of Justice on this issue[,] expressed in internal memoranda and let-

ters, and before the courts, has been that TVA had independent litigating authority." *Id.*

The two other cases in which DOJ challenged TVA's independent litigating authority agreed with the analysis in *Algernon Blair* and held that, under the TVA Act, TVA has authority to represent itself. *See Cooper,* 723 F.2d at 1563–65; *Dean,* 668 F.Supp. at 653. We cannot agree with EPA's contention that all of these cases were wrongly decided. We agree that the unique history of the TVA [8] and its intended independence compel the results reached in these cases. As the court noted in *Dean:*

> From its inception, TVA has enjoyed an independence possessed by perhaps no other federal agency. The original House Committee stated upon TVA's inception: "We intend that [TVA] shall have much of the essential freedom and elasticity of a private business corporation." McCarthy, Keeping TVA Unshackled—A Continuing Struggle, 49 Tenn. L.Rev. 699, 700 (Summer 1982) (citing H.R.Rep. No. 130, 73d Cong., 1st Sess. 19 (1933)). TVA's independence is underscored by its corporate form, its maintenance of a separate legal staff, *see Algernon Blair Industrial Contractors, Inc. v. TVA,* 540 F.Supp. 551 (M.D.Ala. 1982), its removal from centralized control in Washington, its discretionary ratemaking authority, *see Mobil Oil Corp. v. TVA,* 387 F.Supp. 498, 509 n. 28 (N.D.Ala.1974), and its exemption from at least 16 provisions of the Administrative Procedures Act, 49 Tenn.L.Rev. at 701, n. 6.

> *Id.* at 652 n 1.

---

**8.** TVA is a federal corporation created by the Tennessee Valley Authority Act of 1933, 16 U.S.C. §§ 831–831ee (1994 & Supp. IV 1998).

Moreover, in 1983 Congress confirmed TVA's independent litigating authority when it prohibited the Attorney General from using any funds appropriated by Congress "to represent the Tennessee Valley Authority in litigation" unless requested by TVA to do so. Public Law No. 98–181, § 1300, 97 Stat. 1292. The congressional history for this prohibition reveals the following: "In its 50–year history, TVA has conducted its own litigation and no court at any level has ever questioned TVA's right to do so. If TVA were to delegate or otherwise surrender jurisdiction over its legislatively mandated responsibilities for litigation in this area, it would seriously undermine its independence over all other aspects of its program." H.R.Rep. No. 98–232, 98th Cong., 1st Sess. (1983), at 45–46.

The decisions of other courts, the language of the TVA Act, Congress' subsequent statements, and TVA's long history of self-representation without DOJ objection convince us that TVA does possess independent litigating authority and EPA's argument is therefore without merit.

## C. Justiciability: Intrabranch Disputes and the "Case or Controversy" Requirement

EPA next argues that there is no justiciable case or controversy here because both TVA and EPA are executive branch agencies whose leaders serve at the pleasure of the President, and disputes between commonly controlled agencies lack the concrete adversity necessary to present an Article III case or controversy. The Constitution's case or controversy requirement gives rise to a "general principle that no person may sue himself." *United States v. ICC*, 337 U.S. 426, 430, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949). EPA argues that, although the Supreme Court has recognized certain exceptions to this principle and has occasionally found a justiciable controversy where the United States was both plaintiff and defendant, the present case does not fall within any of the relatively narrow circumstances where this has occurred. Recognizing that many cases exist in which executive branch agencies have litigated as adverse parties, EPA argues that all of these cases are distinguishable. According to EPA, intra-executive branch disputes can be part of an Article III case or controversy only where: (1) one of the disputants is an independent regulatory agency the leaders of which are insulated from the President's discretionary removal authority; (2) the litigation involves an agency whose position is aligned with that of a private party who is the real party in interest; or (3) one of the parties is the target of a federal criminal investigation or prosecution. Arguing that TVA's dispute with EPA cannot fit within any of these exceptions, EPA contends that TVA's petitions should be dismissed.

The first class of cases that EPA seeks to distinguish are those involving agencies whose leaders are statutorily protected against removal, such as the Federal Labor Relations Authority, ("FLRA"),[9] the Federal Energy Regulatory Commission ("FERC"),[10] the former Federal Maritime

---

9. The FLRA has opposed other Executive Branch agencies in a number of cases concerning the rights of federal employees. These include *NASA v. FLRA*, 527 U.S. 229, 119 S.Ct. 1979, 144 L.Ed.2d 258 (1999), *National Fed'n of Fed. Employees, Local 1309 v. Department of the Interior*, 526 U.S. 86, 119 S.Ct. 1003, 143 L.Ed.2d 171 (1999), and *De-* *partment of the Treasury v. FLRA*, 494 U.S. 922, 110 S.Ct. 1623, 108 L.Ed.2d 914 (1990).

10. FERC and the Department of the Interior advocated opposing positions concerning the licensing of hydroelectric development on federally protected land in *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466

Board ("FMB"),[11] the former Interstate Commerce Commission ("ICC"),[12] and the former Federal Power Commission ("FPC").[13] Each of these entities is (or was) an independent regulatory agency led by presidentially appointed, Senate confirmed officials serving fixed terms. However, all of these appointees enjoy (or enjoyed) protection from removal for reasons other than "inefficiency, neglect of duty, or malfeasance in office."[14] EPA argues that this distinction is significant because for-cause removal provisions effect a reduction in presidential control that is typically substantial and in some circumstances constitutionally decisive. In this case, both the head of the EPA and, EPA argues, the three-member board that heads TVA, *see Morgan v. TVA*, 115 F.2d 990 (6th Cir. 1940) (upholding President's power to re-move a TVA director), serve at the pleasure of the President.

The second category of cases EPA seeks to distinguish consists of those in which, although federal agencies were involved on both sides, the litigation involved federal agencies and non-governmental real parties in interest who claimed rights under decisions of other federal agencies. EPA points to a series of related bank merger cases in which the Department of Justice filed civil anti-trust actions to enjoin the completion of bank mergers that had been approved by the Comptroller of the Currency.[15] The Comptroller of the Currency, a Treasury Department official who serves at the pleasure of the President, intervened to defend his decisions pursuant to specific intervention authority conferred by the Bank Merger Act of 1966.[16] None

U.S. 765, 104 S.Ct. 2105, 80 L.Ed.2d 753 (1984).

**11.** The former FMB advocated positions adverse to positions advocated by the Department of Justice in its anti-trust enforcement capacity in *Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952), and *FMB v. Isbrandtsen Co.*, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958).

**12.** The former ICC defended rate decisions in favor of freight carriers and against federal agencies as shippers (or advocates for shippers) in *United States v. ICC*, 352 U.S. 158, 77 S.Ct. 241, 1 L.Ed.2d 211 (1956), *Secretary of Agriculture v. U.S.*, 347 U.S. 645, 647, 74 S.Ct. 826, 98 L.Ed. 1015 (1954), *United States v. ICC*, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949), and *ICC v. Jersey City*, 322 U.S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944).

**13.** The FPC defended licensing decisions authorizing private development of hydroelectric sites that the Department of the Interior sought to control in *Udall v. FPC*, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967), and *United States ex rel. Chapman v. FPC*, 345 U.S. 153, 73 S.Ct. 609, 97 L.Ed. 918 (1953) (same).

**14.** *See* 5 U.S.C. § 7104(b)-(c) (1994) (FLRA); 41 U.S.C. § 7171(b) (1994) (FERC); Reorg.

Plan No. 21 of 1950 § 102, 49 U.S.C.App. § 11 (1988) (ICC). FPC Commissioners served fixed terms in a quasi-adjudicatory capacity, and enjoyed implied for-cause protections, although the issue was never litigated. *See* 16 U.S.C. § 792 (1976); *Wiener v. United States*, 357 U.S. 349, 353–56, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958).

**15.** *See, e.g., United States v. Connecticut Nat'l Bank*, 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974); *United States v. Marine Bancorporation*, 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *United States v. First City Nat'l Bank*, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967); *see also, e.g., United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963) (comparable antitrust action in which the Comptroller did not participate).

**16.** *See* 12 U.S.C. § 1828(c)(7)(D). Enactment of this intervention provision in 1966 assured that courts would not bar the Comptroller from participating in antitrust litigation on grounds that it had no cognizable interest. *See, e.g., United States v. Third Nat'l Bank*, 36 F.R.D. 7, 10 (M.D.Tenn.1964) (denying intervention because "the Comptroller, having fully exercised his statutory authority and duty, ha[d] no interest in the subject matter of the [subsequent antitrust enforcement] action").

of the Court's bank merger decisions discussed the justiciability of such a dispute between the Department of Justice and the Comptroller General, because, EPA suggests, the real dispute arose between the United States and the banks that sought to merge, and the existence of a case or controversy between those real parties in interest was self-evident. EPA also points to *United States v. ICC*, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949), which concerned the rates that the Army paid for certain freight shipments. In that decision, the Court's finding of justiciability was supported in part by the observation that certain railroads, rather than the ICC, were the "real parties in interest" in opposition to the government as shipper. *ICC*, 337 U.S. at 432, 69 S.Ct. 1410. The present case, by contrast, does not involve any third parties as the real parties in interest. TVA is the real party in interest, and the private parties' asserted interests relate to the effect of the EPA's orders on TVA. EPA therefore argues that this case is distinguishable from *ICC*.

Finally, EPA attempts to distinguish *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), in which the Court found that a dispute between a special prosecutor and President Nixon concerning the validity of a subpoena issued to the President for the collection of evidence in a pending criminal case was justiciable. The Court observed that a Department of Justice regulation gave the special prosecutor limited protection from immediate removal, at least "[s]o long as this regulation [remained] in force." *Id.* at 696, 94 S.Ct. 3090. In addition, the Court noted that the President had a personal interest in the proceeding, having been identified as an unindicted co-conspirator, and that questions as to the validity of subpoenas incident to criminal investigations had traditionally been considered justiciable. *See id.* at 687, 697, 94 S.Ct. 3090. The Court then concluded that "[i]n light of the uniqueness of the setting in which the conflict ar[ose], the fact that both parties [were] officers of the Executive Branch [could not] be viewed as a barrier to justiciability." *Id.* at 697, 94 S.Ct. 3090.

Initially, we note that none of the cases identified by EPA delineate three narrow exceptions to a general rule of non-justiciability. Each of these cases addressed only the situation before the court and did not purport to establish any rule of general applicability or exceptions thereto. In *ICC*, for example, the Court did not base its decision solely on the conclusion that the railroads were the real parties in interest.[17] It also stated that it was necessary to inquire whether the case "involves controversies of a type which are traditionally justiciable," 337 U.S. at 430, 69 S.Ct. 1410. It noted, moreover, that since all other shippers could invoke the protection of the ICC, the government, in its capacity as a shipper, should be entitled to the same regulatory protection. *Id.* at 431, 69 S.Ct. 1410. Finally, although one issue raised by the case involved the railroads' liability to the government, the second issue involved the government's challenge of the ICC's order as arbitrary and capricious. *Id.* In this second issue, government

---

**17.** The basic facts of the case are as follows. The United States provided wharfage services at certain ports for railroad companies transporting goods to the ports. When the United States sought reimbursement for these services, the railroads refused to pay. The United States then asked the Interstate Commerce Commission (ICC) to order the railroads to compensate the United States for the services. ICC rejected the United States' request, and the United States sought judicial review of the agency's order dismissing the claim. 337 U.S. at 428–29, 69 S.Ct. 1410.

agencies appeared to be the real parties in interest on both sides. Nonetheless, the Court held that "[t]his charge alone would be enough to present a justiciable controversy." *Id.*

We are also unpersuaded by EPA's effort to place *Nixon* in a class by itself. As in *ICC,* the *Nixon* Court asked whether the dispute involved "the kind of controversy that courts traditionally resolve." 418 U.S. at 696, 94 S.Ct. 3090. Moreover, it found that in the circumstances of the case, where the special prosecutor sought subpoenaed material for a criminal prosecution opposed by the President with his assertion of privilege against disclosure, "th[e] setting assures there is 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Id.* at 697, 94 S.Ct. 3090 (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). *Nixon* therefore appears to articulate a general analytical framework, directing courts to inquire whether the controversy is one that is typically justiciable, and whether the setting of the case is one that demonstrates concrete adversity between the parties.

Three trial court decisions have specifically addressed the justiciability of disputes between TVA and other executive branch agencies whose heads serve at the pleasure of the President. In *United States ex rel. TVA v. Easement and Right of Way Over Certain Land in Bedford County, Tennessee,* 204 F.Supp. 837 (E.D.Tenn.1962)—the only one of the cases decided prior to *Nixon*—TVA sought to condemn land in which the Farmers' Home Administration (FHA) held a security interest. The district court found that "there could not be any issue between the TVA and FHA, both being the United States, which this Court could litigate or adjudicate.... The settlement of inter-agency problems within the United States Government is not a judicial function but rather an administrative function." *Id.* at 839. However, the court also observed that "[a]lthough the TVA is a federal governmental corporation, with jurisdictional and procedural consequences that may not be the same in all instances as though it were an agency of the Federal Government ... *for the purposes of this suit* in which the TVA seeks to exercise the power of eminent domain it stands as an agency of and acts in the name of the United States." *Id.* (emphasis added).

The other two cases found a justiciable controversy arising out of a 1987 dispute between TVA and the Department of Energy (DOE) concerning DOE payments for electric power. The district court for the Eastern District of Tennessee, where TVA initially filed its claim for money damages, held that the suit was justiciable, although filed in the wrong court. *See Dean v. Herrington,* 668 F.Supp. 646, 653 (E.D.Tenn.1987). The case was transferred to the Claims Court, which ruled that the dispute would be justiciable following completion of a mandatory dispute resolution process that the President had prescribed by Executive Order. *TVA v. United States,* 13 Cl.Ct. 692, 700–02 (1987).[18] In *Dean,* the court suggested that *Nixon* had called into question the decision in *United States ex rel. TVA v. Easement & Right of Way* finding no justiciable controversy between TVA and FHA. Relying on *Nixon* and *United States v. Federal Maritime Commission,* 694 F.2d 793 (D.C.Cir.1982), the court concluded that the relevant inquiry was, first, whether "the claim raised is of a type traditionally thought to be justiciable," and second,

**18.** We discuss the effect of the executive or- ders on this case below.

whether it is "raised in a setting that assures 'concrete adverseness' of the parties". *Dean,* 668 F.Supp. at 652. The court answered both questions in the affirmative, finding that the dispute was essentially a breach of contract claim, and that the adverseness of the parties was sharpened by TVA's "unique independence as a federal agency." *Id.*

The Claims Court agreed with the conclusion in *Dean* that the controversy was justiciable. It distinguished *United States ex rel. TVA v. Easement & Right of Way* on the ground that, *in the context of a condemnation suit,* TVA was statutorily required to take any real property in the name of the United States, but noted that, in all other contexts, TVA acquired property in its own name. *TVA,* 13 Cl. Ct at 697–98. The court agreed that *Nixon's* focus on the nature of the controversy— whether it is of a kind that courts traditionally resolve, and whether the setting assures concrete adverseness—identified the appropriate inquiry. *Id.* at 698–99, 94 S.Ct. 3090. It then noted that the dispute between TVA and DOE was not illusory; that TVA has a separate corporate identity and possesses the power to enter into binding contracts for the provision of electric utility services; that it has the authority to sue for enforcement of its contracts; and that its litigation authority is independent of the Department of Justice. *Id.* at 699, 94 S.Ct. 3090.

We likewise believe that *Nixon* establishes a two-pronged case or contro-versy analysis in the context of intra-branch disputes. First, we must determine whether the issue is traditionally justiciable. Second, we must decide whether the setting of the dispute demonstrates true adversity between the parties. Applying that analysis here leads to the conclusion that this case presents a justiciable controversy. There can be little question that the issue presented is traditionally justiciable. The Clean Air Act explicitly provides for judicial review of final actions taken by the Administrator of the EPA. 42 U.S.C. § 7607(b). A privately-owned power generating facility would thus indisputably be entitled to petition for appellate review of a final order, and there is no reason to deny the same right to a federal facility. *See ICC,* 337 U.S. at 431, 69 S.Ct. 1410 (suggesting that the United States, in its capacity as a shipper, should be entitled to the same protections as a private shipper).[19] We are also convinced that the setting of this dispute presents concrete adversity. We note, as have previous courts, that TVA possesses unique independence as a federal agency. *See Dean,* 668 F.Supp. at 652 n. 1; *Algernon Blair,* 540 F.Supp. at 553 ("[O]ne of the reasons that TVA was set up as an independent corporation was to give it a greater degree of independence that was routinely enjoyed by governmental agencies."). Moreover, EPA and TVA advocate genuinely conflicting views, and the adversity is more than adequate to "sharpen[ ] the presentation of issues...." *Nixon,* 418 U.S. at 697, 94 S.Ct. 3090.[20]

**19.** We assume there is a symmetry between TVA's right to petition for review and EPA's right to bring a judicial enforcement action against a federal agency to enforce a final order. EPA contends that it lacks the power to bring a judicial enforcement action against TVA. Initial Brief of Appellee at 48. However, we believe that, for the same reasons that TVA may obtain review of EPA's Order, EPA would be able to bring suit to enforce its Order.

**20.** As TVA points out, § 15d of the TVA Act requires TVA to finance its power program through sales of bonds backed solely by TVA's power revenues and through such revenues themselves. Section 15d(b) provides that such bonds "shall not be obligations of, nor shall payment of the principal thereof or in-

We therefore find that this particular controversy between these executive branch agencies is justiciable.

### D. Finality: Reviewability of the EAB Decision

 EPA next argues that the EAB decision does not satisfy the criteria that must be met before an agency action is judicially reviewable. The CAA authorizes the filing of a petition for review in this Court from any "final action" of the administrator. It states, in relevant part, that "[a] petition for review of the Administrator's action [under certain specific provisions of the CAA], or any other final action of the Administrator ... which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit." CAA § 307(b)(1), 42 U.S.C. § 7607(b). The Supreme Court has interpreted the phrase "any other final action" to incorporate the finality requirement of the APA. *See Harrison v. PPG Industr., Inc.*, 446 U.S. 578, 586, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980); *see also* 5 U.S.C. § 704 (APA finality requirement). In *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), recently reaffirmed in *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001), the Supreme Court explained that two conditions must be satisfied in order for agency action to be "final" for purposes of appellate review: first, the action must mark the "consummation" of the agency's decision-making process; and second, it must "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78, 117 S.Ct. 1154 (citation and quotations omitted).

EPA argues that, under this two-prong test, the EAB decision is not reviewable agency action. While EPA admits that the EAB decision represents the "consummation" of its decision-making process in this case, thus satisfying the first prong, it argues that the second prong of the test cannot be met here, because, in its view, it could not bring a judicial enforcement action against TVA to enforce the EAB decision because of the lack of concrete adversity between two federal agencies. Suggesting that a judicial enforcement action is "intrinsic" to the second prong of *Bennett*, EPA states that TVA may not obtain judicial review of an action as to which EPA could never have recourse to judicial compulsion in the face of noncompliance by TVA.

We disagree for two reasons. First, as stated previously, we believe that there can be concrete adversity between two executive branch agencies, and therefore we do not accept EPA's position that it would not be entitled to obtain judicial enforcement of the EAB decision against TVA. Second, we see no reason to assume that the second prong of the *Bennett* test requires the EAB decision to be judicially enforceable: it would seem to be satisfied as long as "rights or obligations have been determined." As EPA itself observes, "EPA expects that federal agencies will comply with its final orders...." EPA Initial Br. at 48. That expectation suggests—and we agree—that an obligation has in fact been created. This satisfies the second prong of the *Bennett* test, and we

---

terest thereon be guaranteed by, the United States." In addition, § 15d(f) directs TVA to charge rates that will produce gross revenues sufficient to enable it to meet all of its obligations, while at the same time keeping rates as low as feasible, and otherwise advancing the physical, economic, and social development of its area. TVA claims that the requirements that EPA has imposed in its order could cost TVA billions of dollars and compel TVA to raise its rates.

therefore find that the EAB decision is a reviewable final order.[21]

### E. The Effect of Executive Orders 12146 and 12088

EPA next argues that even if the EAB decision is potentially a reviewable final order, it is not yet ripe for review because the dispute has not been submitted to the Attorney General for resolution as required by Executive Order 12146, 3 C.F.R. 409 (1979), or to the Office of Management and Budget as required by Executive Order 12088, 3 C.F.R. 243 (1978). We must first consider whether these executive orders apply to TVA, and if so, what effect they have on our jurisdiction to consider the matter before us.

Executive Order 12146 (which also appears following 28 U.S.C. § 509) provides in relevant part:

> 1–401. Whenever two or more Executive agencies are unable to resolve a legal dispute between them, including the question of which has jurisdiction to administer a particular program or to regulate a particular activity, each agency is encouraged to submit the dispute to the Attorney General.
>
> 1–402. Whenever two or more Executive agencies whose heads serve at the pleasure of the President are unable to resolve such a legal dispute, the agencies shall submit the dispute to the Attorney General prior to proceeding in any court, except where there is specific statutory vesting of responsibility for a resolution elsewhere.

Citing *Dean v. Herrington*, 668 F.Supp. 646, 652–53 (E.D.Tenn.1987), TVA first argues that this Executive Order does not apply to TVA at all. In *Dean*, the court suggested that the Executive Order, entitled "Management of Federal Legal Resources," was designed to "coordinate the legal resources of the numerous federal agencies represented in litigation by the Justice Department." *Id.* at 653. Since TVA has actual control of its litigation to the exclusion of the Attorney General, the court held that the Executive Order had no application. The court also observed that the Order created a "Federal Legal Council," but that "TVA was not one of the 15 initial members ... nor is it claimed by DOE that TVA has ever been a member...." *Id.* at 652.

*Dean*'s conclusion that the Executive Order does not apply to TVA was criticized in *TVA v. United States*, 13 Cl.Ct. 692 (1987). There, the claims court first noted that the membership of the Federal Legal Council "is not a listing of agencies that are subject to the order." *Id.* at 700. Second, the court disagreed with *Dean*'s suggestion that the Order was intended to cover only those federal agencies without the power to represent themselves in litigation. For example, § 1–302(a) of the Executive Order provides that "[a]ll Agencies with authority to litigate cases in court shall promptly notify the Attorney General about those cases that fall in classes or categories designated from time to time by the Attorney General." *See also* § 1–301 (providing for notice of litigation covering

---

**21.** In challenging the finality of the ACO, EPA argued that its compliance orders were not "final," and therefore not reviewable, until it brought an enforcement action in the district court. While we are not persuaded that a compliance order may not be reviewed prior to an enforcement action, *see, e.g., Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 586, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980) (considering a decision of the EPA Administrator final because "[s]hort of an enforcement action, EPA has rendered its last word on the matter."); *State of Alaska v. EPA*, 244 F.3d 748, 750 (9th Cir.2001); *Allsteel, Inc. v. EPA*, 25 F.3d 312, 315 (6th Cir.1994), EPA's argument is undercut by its assertion that in this case it would not be able to bring an enforcement action against TVA.

"all civil litigation pending in the courts in which the Federal Government is a party or has a significant interest."). We are persuaded that the claims court has the better reading of the Order, and that on its face it does apply to TVA. "The district court's correct conclusion that TVA possesses independent litigation authority is not diminished by the fact that the Executive Order attempts to coordinate federal interagency litigation resources and to resolve disputes before court action is commenced." *TVA*, 13 Cl.Ct. at 700.

We are not persuaded by TVA's alternative argument that, because the CAA requires that "the person to whom [a compliance order] is issued" must have "had an opportunity to confer with the Administrator [of EPA] concerning the alleged violation" before the order may take effect, 42 U.S.C. § 7413(a)(4), there is a "specific statutory vesting of responsibility for a resolution elsewhere," thus bringing this case within the exception specified in § 1–402 of the Executive Order. (TVA and EPA engaged in the required conference on December 20, 1999.) TVA points out that the Act defines a "person" to include agencies of the federal government, and contends that the conference provided for by the act is the statutory method provided by Congress for informal dispute resolution. According to TVA, therefore, by its own terms the Executive Order does not apply to this case.

██ But as EPA argues, § 7413(a)(4) does not create a dispute resolution mechanism like that established by executive order, "but merely provides that an order issued under that section shall not be final until the recipient has had an opportunity to confer with the Administrator." EPA's Reply to TVA's Opposition to EPA's Mo-

tion to Dismiss at 7. The CAA conference requirement simply provides EPA and TVA an opportunity to resolve the dispute on their own, but it is not a dispute resolution mechanism akin to that established by the Executive Order, because it does not provide for mediation or participation by a third party. The CAA conference requirement applies to any party, whether private or public, receiving a compliance order from EPA.[22] At such a conference, each party can be expected to present its own point of view. While the factors that will normally be considered at such a conference may overlap to some extent with factors that would be considered by the Attorney General evaluating a dispute between two federal agencies pursuant to the Executive Order, they are not identical. One purpose of review under the Executive Order, as the court in *TVA* stated, is "to coordinate federal interagency litigation resources and to resolve disputes before court action is commenced." 13 Cl. Ct. at 700. Therefore the Attorney General, in his capacity as the executive branch official responsible for resolving the dispute, will take into account a broader range of factors—in particular, the coordination of federal interagency litigation resources—than EPA and TVA would consider in a conference between them alone. It is therefore likely that the purpose served by E.O. 12146 would be defeated if it could be circumvented by a fruitless private conference between TVA and EPA. Moreover, as EPA points out, since the text of the Order reflects a presumption that the agencies will first attempt to resolve the dispute between themselves, we do not think a conference between the two agencies alone constitutes a "specific statutory vesting of re-

22. The conference requirement obviously does not specifically contemplate a dispute between two federal agencies.

sponsibility for a resolution elsewhere" that can supplant the requirement that they subsequently submit the dispute to the Attorney General. For the foregoing reasons, we conclude that the E.O. 12146 applies to TVA in this case.[23]

█ In addition to E.O. 12146, EPA has argued that Executive Order 12088 likewise applies in this case. That Order states, in relevant part:

> 1–602. The Administrator shall make every effort to resolve conflicts regarding [a CAA] violation between Executive agencies.... If the Administrator cannot resolve a conflict, the Administrator shall request the Director of the Office of Management and Budget to resolve the conflict.

In reply, TVA relies on the fact that this Order was amended by Executive Order 12580, 3 C.F.R. 193 (1987), to add the following:

> Nothing in this Order shall create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person.

TVA presumably understands EPA's reliance on the Order as a basis for delaying our review of its claim as an attempt to enforce a right or benefit at law. We disagree with this reading. EPA has argued that, as a result of the order, we lack jurisdiction to review TVA's petition at this stage. A challenge to our jurisdiction is not an attempt to enforce a right or benefit. Therefore, we also accept EPA's argument that E.O. 12088 applies to this case.

█ Having concluded that the orders apply, however, we are still left to decide their effect on the case. We find that the orders do not operate to deprive us of jurisdiction. EPA is free to seek a remedy for TVA's failure to comply within the Executive Branch. Indeed, there is no indication in the briefs and record before us that EPA itself has acted to comply with the executive orders. But E.O. 12088 is directed specifically to the EPA Administrator, not to the agency receiving the compliance order: "If the Administrator cannot resolve a conflict, the Administrator shall request the Director of the Office of Management and Budget to resolve the conflict." § 1–602. Thus we find difficult to understand EPA's complaint that TVA has not complied with it. Moreover, if EPA believed that the Attorney General, acting pursuant to E.O. 12146, could prevent or cut short this litigation, presumably there is nothing to prevent EPA from taking steps to submit the dispute to the Attorney General on its own.

The nature of EPA's argument is thus not that it has been unfairly deprived of recourse to Executive Branch dispute resolution mechanisms, but that we may not entertain TVA's petition *before* both parties have submitted the dispute to the requisite Executive Branch officials. Because this argument is a novel (or at least uncommon) one, we take some time to explain why we disagree.

We acknowledge at the outset that in *TVA* the claims court found that, in light of E.O. 12146, it was "altogether appropriate to dejudicialize the dispute and allow the Executive an opportunity to act." 13 Cl. Ct. at 701. Accordingly, it ordered the parties to submit their dispute to the Attorney General, allowing them to return to court if the administrative resolution proved unsatisfactory. *Id.* at 703. However, the court also found that the existence of the Executive Order did not ren-

---

**23.** TVA has also argued that it need not comply with the Order because to do so would be futile. For reasons discussed *infra,* we do not believe we should create exceptions to Executive Branch rules, and think that TVA's argument is best addressed to the Executive.

der the controversy non-justiciable and thereby deprive the court of jurisdiction. *Id.* at 701 n. 9. It did not articulate the legal basis of its belief that it was "appropriate to dejudicialize the dispute"— whether its concern, in other words, lay in a lack of exhaustion of administrative remedies, or of ripeness, or was grounded in some other principle like separation of powers. We will consider these possibilities as a basis for suspending our review pending the outcome of internal Executive Branch procedures.

### i. *Exhaustion of Administrative Remedies*

■ As a general matter, we have held that the exhaustion of administrative remedies requirement is not jurisdictional. *See, e.g., N.B. by D.G. v. Alachua County Sch. Bd.,* 84 F.3d 1376, 1379 (11th Cir. 1996); *Panola Land Buyers Ass'n v. Shuman,* 762 F.2d 1550, 1556 (11th Cir.1985); *but see Gonzalez v. United States,* 959 F.2d 211, 212 (11th Cir.1992) (holding that "exhaustion of administrative remedies is jurisdictional" in context where an administrative agency—the Bureau of Prisons— is responsible for computation of sentences). Of course, even where the lack of exhaustion does not create a jurisdictional bar, a court generally will not entertain the claim unless the unexhausted remedies are inadequate or futile. *See N.B. by D.G.,* 84 F.3d at 1379. Therefore, we must decide whether the executive orders at issue here present a traditional exhaustion requirement that either deprives us of jurisdiction or prevents our review for prudential reasons. We believe they do not.[24]

The executive orders cited by EPA are not on a par with a *statutorily* mandated exhaustion requirement, in which Congress has specifically precluded review of a claim before administrative remedies have been exhausted. In such cases, Congress has created the statutory scheme under which the right of judicial review is available in the first place, and so it has the power to specify at what point in the process the courts have jurisdiction over the claim. But the executive orders here do not operate pursuant to Congressional authority, nor are they a part of the statutory scheme—the CAA—under which TVA is seeking judicial review.[25] The Executive Branch does not confer the necessary jurisdiction on the courts in the first place, and thus we fail to see how an order governing the internal procedures of the Executive Branch could, in and of itself, operate to deprive this Court of jurisdiction if the parties satisfied the relevant *statutory* requirements for judicial review.

Nor do we believe that the executive orders give us reason to decline to exercise our jurisdiction. Insofar as it is a judicially developed doctrine, the exhaustion requirement exists "1) to permit the exercise of agency discretion and expertise on issues requiring these characteristics; 2) to allow the full development of technical issues and a factual record prior to court review; 3) to prevent deliberate disregard and circumvention of agency procedures established by Congress; and 4) to avoid unnecessary judicial decisions by giving the agency the first opportunity to correct any error." *Id.* at 1378–79. We do not believe that any of these considerations

---

24. We note initially a difference in form: traditional administrative remedies are available to one party against the agency. Here, the executive orders apply to both EPA and TVA, and thus EPA is complaining of TVA's failure to seek remedies it has not pursued either.

25. They are therefore unlike the case in which the head of an agency—an Executive Branch official—may determine what constitutes exhaustion in the context of a statutory scheme requiring it.

are relevant here; and none of them is implicated by the executive orders. As EPA concedes, were TVA a private party, all administrative remedies would be exhausted at this stage. Having already conducted a review of its compliance order and issuing the EAB decision, EPA cannot argue that it has not had the opportunity to exercise its discretion and expertise, or to develop the factual record, or to correct any errors. And TVA's failure to comply with Executive Order 12146 does not amount to a "disregard and circumvention of agency procedures established by Congress."

Of course, the exhaustion doctrine also reflects a concern with judicial efficiency. "A complaining party may be successful in vindicating his rights in the administrative process. If he is required to pursue his administrative remedies, the courts may never have to intervene." *McKart v. United States,* 395 U.S. 185, 195, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). It is possible that, were EPA and TVA to avail themselves of the dispute resolution mechanisms established by either of the two executive orders, it would obviate the need for judicial review of the controversy. But we do not believe that to require EPA and TVA to do so would give the Executive Branch an opportunity to head off this litigation that does not otherwise exist. Since both EPA's Administrator and TVA's board serve at the pleasure of the President, the President could bring this litigation to a close on his own initiative at any point. He has not done so. Without more than a remote possibility that compliance with the executive orders would resolve the dispute, we do not believe the failure to exhaust those remedies erects any barrier to our review of EPA's order to TVA.

### ii. Ripeness

Closely related to the exhaustion doctrine—at least in this context—is the no-tion of ripeness, which is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Serv., Inc.,* 509 U.S. 43, 58 n. 18, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). Thus, like a lack of exhaustion, the lack of ripeness will not always operate to deprive a court of jurisdiction, but "[p]roblems of prematurity and abstractness may well present 'insuperable obstacles' to the exercise of the Court's jurisdiction, even though that jurisdiction is technically present." *Socialist Labor Party v. Gilligan,* 406 U.S. 583, 588, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972) (citation omitted). In *Abbott Laboratories v. Gardner,* the Court explained the ripeness doctrine as follows:

> [I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

So understood, we do not believe the ripeness doctrine prevents our review of the petitions in this case. Ripeness is concerned principally with the development of the legal or factual issues before the court. By EPA's own admission, the EAB decision represents the culmination of its decision-making process, and there is nothing abstract about the conflict between TVA and EPA. The fact that TVA

is an agency subject to the executive orders does not render the legal and factual issues in this controversy any less developed than they would be if TVA were a private party, and therefore the executive orders do not create any additional ripeness problem.[26] We find that the issues presented here are fit for judicial decision.

### iii. Separation of Powers

The final possibility is that, out of a respect for the principle of separation of powers, we should abstain from exercising our jurisdiction at least until the Executive Branch has had an opportunity to employ its own dispute resolution mechanisms. After all, neither E.O. 12088 nor E.O. 12146 precludes eventual recourse to the courts;[27] rather, they indicate that agencies should use internal Executive Branch procedures *first.* Therefore—the argument goes—by declining to review the controversy until they have done so, we would simply be showing a due regard for the functions and procedures of the Executive Branch.

While this argument is not without some appeal, ultimately we are not persuaded. We note, as an initial matter, that our review of TVA's petition before it has complied with the executive orders would not intrude on Executive Branch functions in such a way as to be *constitutionally* impermissible under the separation of powers doctrine. One branch violates the constitutional separation of powers only when it prevents another "from accomplishing its constitutionally assigned functions," and

the interference with the other branch is not "justified by an overriding need to promote objectives" within its own constitutional authority. *Nixon v. Adm'r of Gen. Serv.,* 433 U.S. 425, 443, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). Evaluating the merits of TVA's petition at this stage would not interfere in any way with executive functions. As we noted earlier, the President has possessed the power at all points in this process to control or head off the litigation, and may still do so if he wishes. Accordingly, our review of the controversy does not diminish, or prevent the exercise of, presidential authority over the parties.

In the absence of a constitutional separation of powers problem, our decision to postpone review of this case would have to be based on a new incarnation of the doctrine of judicial abstention: although we possess statutory power to hear TVA's claims, we would nonetheless abstain from doing so out of respect for the Executive's clear indication that its agencies should employ that branch's own procedures before proceeding to court. Two considerations counsel against our adopting such a position. First, the Executive has the ability to enforce its own internal procedural rules. Even now, were the President to conclude that TVA was before this Court in violation of Executive Branch operating procedures, he could act to head off the litigation. A due regard for the Executive may thus counsel us to leave the enforcement of its internal rules to its own discretion. Second, our review of TVA's petition

---

**26.** Nor do the executive orders mean that the effects of EPA's order are not "felt in a concrete way" by TVA. EPA has not stayed the implementation of its order pending any Executive Branch dispute resolution mechanisms.

**27.** E.O. 12146 states only that "the agencies shall submit the dispute to the Attorney Gen-

eral *prior to proceeding in any court,*" § 1–104 (emphasis added), and E.O. 12088 states in § 1–604 that "[t]hese conflict resolution procedures are in addition to, not in lieu of, other procedures, including sanctions, for the enforcement of applicable pollution control standards."

takes place pursuant to statutory authority. Congress has specified the conditions under which we should review a claim such as that brought by TVA, see 42 U.S.C. § 7607(b), and we have determined that those conditions are satisfied here. Therefore, separation of powers considerations do not clearly recommend abstention: they may equally recommend our hearing TVA's claim now, when Congress has indicated that we should do so.

In sum, then, we find that under existing doctrines, the executive orders provide us with no compelling reason to decline to exercise our jurisdiction.

*F. Standing of Private Petitioners*

Even if the other jurisdictional challenges raised by EPA are without merit, EPA argues that the petitions brought by APC, Duke, and TVPPA et al. must be dismissed for lack of standing because the private petitioners cannot show a legally cognizable injury, caused by EPA, that can be redressed by this Court. It contends that the injuries alleged by the private petitioners are highly speculative—resulting, if at all, from decisions made by TVA in order to comply with EPA's orders—and that none of the interests the private petitioners seek to protect—relating to their right to reliable, low-cost electricity supplied by TVA—is within the "zone of interests" protected by the CAA.

██ In order to have standing under the case or controversy requirement of Article III, a plaintiff must establish three elements: (a) injury in fact—that is, a harm that is concrete and particularized, and actual or imminent, not conjectural or hypothetical; (b) a causal connection between the plaintiff's harm and the defendant's conduct; and (c) a likelihood that the requested relief will redress the alleged injury. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103, 118

S.Ct. 1003, 140 L.Ed.2d 210 (1998); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–62, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Georgia State Conference of NAACP Branches v. Cox*, 183 F.3d 1259, 1262–63 (11th Cir.1999). It is undisputed in this case that EPA's orders do not apply directly to any of the private petitioners. When a plaintiff's asserted injury arises from the government's allegedly unlawful regulation of someone else,

> causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action. . . . The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.

*Lujan*, 504 U.S. at 562, 112 S.Ct. 2130 (citations omitted). While this situation does not preclude a finding that the plaintiff has standing, "it is ordinarily 'substantially more difficult' to establish." *Id.* (citation omitted). We begin with a discussion of Alabama Power and Duke, who allege largely identical injuries, and then consider the standing of TVPPA.

*i. Alabama Power Company and Duke Energy Corporation*

██ APC and Duke allege that they will be injured by EPA's orders to TVA in four ways. First, they state that, since their electric transmission networks are fully integrated with TVA's and power plant output and availability on the TVA system directly affects power flow and

plant output on their own systems, any disruption to TVA's system will have a direct impact on their own. In particular, they contend that the orders prohibit TVA from engaging in maintenance, repair and replacement projects at its power plants that are necessary to maintain sufficient reserves against unplanned contingencies, which will require APC and Duke to increase production at their own plants to preserve the reliability of the regional power supply. Second, they contend that they will be unlawfully excluded from the process whereby, under the terms of the ACO, EPA will set a schedule for the shut down of TVA's coal-fired power plants, and that the shut down schedule will have a substantial impact on their own generation and transmission system. Third, APC points out that it currently has contractual rights to a substantial amount of TVA power, and claims that the orders will interfere with TVA's ability to meet its power supply responsibilities, which will require APC to incur greater costs from the employment of risk management and hedging techniques. Duke similarly claims that one of its subsidiaries has purchased more than $55 million of electric power from TVA and that the costs imposed by EPA's orders will increase the cost of power charged to TVA customers, including Duke's subsidiary. Finally, EPA has also sued APC and issued a Notice of Violation to Duke Energy for violations of the CAA similar to those it alleges against TVA. APC and Duke argue that EPA is highly likely to use the TVA orders in its case against them, which gives them a substantial interest in seeking their review by this Court. They add that judicial economy is served by testing the orders at this stage, before EPA attempts to use it in civil actions against other electric utilities.

EPA argues that claims of economic injury based on the assumption that the costs of TVA's compliance with EPA orders will be passed on to its ratepayers are too speculative to create standing. According to EPA, TVA could decide to cover the costs of compliance through other means—for example, by issuing debt, or by reallocating its resources. In response, APC and Duke point to *Central Arizona Water Conservation District v. EPA,* 990 F.2d 1531, 1538 (9th Cir.1993), in which the Ninth Circuit found that third parties potentially harmed by agency action had standing to sue. In *Central Arizona,* EPA issued a rule under the CAA that required reduction of emissions from a power plant. In response, local water conservation districts that used electricity from the plant brought an action contesting the rule, claiming they would be injured economically due to a contractual relationship with one of the owners of the plant that would require them to help pay a portion of the costs of installing and maintaining the emissions controls. *Id.* at 1534. However, in the present case, APC and Duke are not contractually bound to share in TVA's costs, so the economic injury is more uncertain than it was in *Central Arizona.* But while APC's and Duke's claim of injury based on increased electricity costs presents a close question, we believe other grounds it asserts are sufficient to confer standing.

For example, we find less speculative APC's and Duke's claim that, due to the interconnectedness of their electric transmission networks with TVA's, they will be required to increase production to compensate for uncertainties and diminished reserves created by TVA's compliance with EPA's orders. APC and Duke have submitted expert declarations in support of this claim; moreover, we note that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion

to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130. Therefore, we believe APC and Duke have adequately alleged injury sufficient to confer standing.[28]

We also believe that there is "a fairly traceable connection between the plaintiffs' injury and the complained-of conduct of the defendant." *Steel Co.,* 523 U.S. at 103, 118 S.Ct. 1003. It is TVA's compliance with EPA's orders that will result in diminished reserves imposing greater costs on APC and Duke. EPA objects that there are "countless ways that TVA could effectuate compliance," and that any effect on APC and Duke is caused by TVA's choices rather than by EPA's orders. However, the Supreme Court rejected a similar argument in *Bennett v. Spear,* stating: "This wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." 520 U.S. 154, 168–69, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). The Court recognized that while the injury should not be the result of the independent action of some third party not before the court, "that does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Id.* at 169, 117 S.Ct. 1154.

EPA argues that, as to the third prong of the standing inquiry, an order of this Court would not redress the alleged injury because a multitude of factors contributes to TVA's ability to supply power to the interconnected systems. We think the fact that something else could conceivably disrupt TVA's power generating capacity is insufficient to justify a conclusion that this Court could not redress the injury. While redressability must not be speculative, it need only be "likely," not certain. *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130. "[A] probabilistic benefit from winning a suit is enough 'injury in fact' to confer Article III standing in the undemanding Article III sense." *North Shore Gas Co. v. E.P.A.,* 930 F.2d 1239, 1242 (7th Cir.1991) (internal citations omitted). We are satisfied that this Court has the power to redress the alleged injury.

In addition to satisfying the constitutional standing requirements, a plaintiff must also satisfy certain prudential standing requirements. In particular, a party's complaint must fall within the "zone of interests" protected or regulated in the statutory provision at issue. *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 475, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *see also Region 8 Forest Serv. Timber Purchasers Council v. Alcock,* 993 F.2d 800, 805 (11th Cir.1993). EPA argues that none of the interests the private petitioners seek to protect are within the zone of interests protected by the CAA.

The test articulated by the Supreme Court and applied in this Circuit to determine if the private petitioners' claims are within the "zone of interests" is as follows:

> In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the

**28.** Accordingly, we need not reach APC's and Duke's other claims of standing. However, we note that we are not persuaded by EPA's contention that this case does not bear on its claims against APC. While there are doubtless factually specific inquiries that must be conducted in each case, legal questions concerning EPA's interpretation of "routine" and its method for evaluating emissions increases are common to both cases. On the other hand, we find unpersuasive APC's and Duke's claim of injury based on their potential exclusion from participating in the formulation of TVA's compliance schedules.

purposes implicit in the statute that it cannot reasonably be assumed the Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

*Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 399–400, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987); *FDIC v. Morley,* 867 F.2d 1381, 1391 (11th Cir.1989).

The purpose of the CAA is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). In directing EPA to promulgate air quality standards, Congress instructed the agency to take into consideration "any adverse public health, welfare, social, economic or energy effects which may result from various strategies for attainment and maintenance of such national ambient air quality standards." 42 U.S.C. § 7409(d)(2). We believe that the issues raised by APC and Duke regarding the reliability and affordability of the power supply are concerns that touch on Congress' purposes in enacting the CAA. Accordingly, we find that they do not lack standing to seek review of EPA's orders in this Court.[29]

*ii. Tennessee Valley Public Power Association*[30]

▪ TVPPA is a nonprofit corporation representing the interests of 110 municipal and 50 rural electric cooperative distributors of electrical power. All but one of these municipal and cooperative electrical systems distribute and sell power purchased from TVA to residents and businesses of the TVA area. They have long-term wholesale power and supply contracts with TVA that require each system to purchase all of its requirements of energy and capacity from TVA. Under these requirements contracts, TVA has the right to adjust or change wholesale and retail rates during the term of the contract. TVPPA therefore contends that its member systems would ultimately be responsible for paying for most of the increases in TVA's costs resulting from EPA's order. It also states that 109 of its members are municipal governments that buy energy and capacity from TVA, and that these communities will suffer an economic disadvantage compared to other communities due to the higher power costs that will result from the compliance order. TVPPA's claimed injury is thus the increased cost of electricity that its members will be forced to pay and the economic disadvantage that its member municipal governments will suffer through increased rates.

As an association suing in its representational capacity, TVPPA must satisfy additional requirements, beyond demonstrating the constitutional prerequisites to standing, in order to have standing to assert the claims of its members. TVPPA must also show that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to TVPPA's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the law suit.

**29.** EPA cites *Dean,* 668 F.Supp. at 653–54, in which the court found that TVPPA was not within the "zone of interests" of either of the statutes that TVPPA cited as authority to bring suit, and therefore held it lacked standing. However, *Dean* did not involve an action under the CAA, so its analysis is not relevant to the present case.

**30.** EPA did not specifically challenge the standing of Memphis Light et al. to pursue 00–16235; therefore, we will not separately address the standing of those entities.

*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 342–43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *see also Doe v. Stincer,* 175 F.3d 879, 882 (11th Cir. 1999). TVPPA therefore must establish that at least one of its members meets all three requirements for standing under Article III.

Like APC and Duke, TVPPA also cites *Central Arizona* in support of its contention that the increased cost of electricity its members will likely have to pay as a result of EPA's compliance order satisfies the actual injury requirement. But again, the situation here is somewhat different. In *Central Arizona,* the plaintiff claimed that it was "contractually required to repay much of [one of the plant owner's] 24.3% share of the costs of installing and maintaining emission controls ... as required by the Final Rule." 990 F.2d at 1537. TVPPA does claim that its members "will be required under the terms of their all-requirements contracts with TVA to pay for the increased rates," but this appears to mean only that they have contracts with TVA under which TVA is entitled to increase its rates. Thus, the question of standing is somewhat closer here than it was in *Central Arizona.* Nonetheless, we think that business realities make it likely that TVPPA's members can expect *some* rate increases as a result of EPA's order, a point that EPA apparently concedes.[31] As the court stated in *Central Arizona,* the EPA order "will likely cause Petitioners *some amount* of pecuniary harm," *id.* at 1538, and that is sufficient to confer standing. Moreover, for the reasons stated in our discussion of APC and Duke, we believe the causation, redressability, and prudential standing requirements are satisfied here.[32]

## CONCLUSION

For the foregoing reasons, we conclude that we possess subject matter jurisdiction to review the petitions filed in this case. By separate Order, oral argument will be scheduled on the merits involved in this appeal.

---

**31.** EPA writes: "EPA estimates, using general information based on past industry costs and practices, that actual potential impact on TVA's rates would be no more than a 3% increase, if any." EPA Reply to Petitioners' Opposition to Motion to Dismiss at 21.

**32.** Therefore, we need not reach TVPPA's second standing argument. However, we note that TVPPA cites *Southwestern Pennsylvania Growth Alliance v. Browner,* 144 F.3d 984 (6th Cir.1998), in which the court found that an organization of major manufacturers and governments in Pennsylvania had standing to challenge an order by the EPA designating a geographical area in Ohio as an attainment area for ozone. This designation enabled Ohio business to pay less for ozone controls than the Pennsylvania government and businesses were required to pay for non-attainment areas. The court wrote: "If the EPA incorrectly redesignated the Cleveland–Akron–Lorain area as attainment, then that area has an economic advantage over its neighbors in southwestern Pennsylvania because businesses in the Ohio area unfairly pay less for ozone control measures. Thus, the southwestern Pennsylvania area, which is designated as nonattainment, suffers an economic disadvantage compared to its Ohio neighbor. This economic disadvantage is an alleged 'injury in fact' directly caused by the EPA's decision, an injury that would be redressed if the decision were overturned by this Court." *Id.* at 988.